**UNITED STATES of America**

v.

**Martin L. GRASS Franklin C. Brown**

No. CRIM.1:CR–02–146–01,
CRIM.1:CR–02–146–02.

United States District Court,
M.D. Pennsylvania.

Jan. 13, 2003.

Rebecca H. Ewing, William H. Jeffress, Mary C. Spearing, Mark T. Stancil, Baker Botts, LLP, Washington, DC, for Martin L. Grass.

Joseph U. Metz, Dilworth Paxon LLP, Harrisburg, PA, Reid H. Weingarten, Erik L. Kitchen, Matthew L. Stennes, Steptoe & Johnson, LLP, Washington, DC, for Franklin C. Brown.

William John Fulton, Harrisburg, PA, Ira H. Raphaelson, O'Melveny & Myers

LLP, Washington, DC, William J. Stuckwisch, O'Melveny & Myers LLP, Washington, DC, for Franklyn M. Bergonzi.

Joshua D. Lock, Harrisburg, PA, Larry Iason, New York, NY, John K. Carroll, David Meister, Clifford Chance Rogers & Wells, LLP, New York, NY, for Eric S. Sorkin.

Kim Douglas Daniel, U.S. Attorney's Office, Harrisburg, PA, for U.S.

## MEMORANDUM

RAMBO, District Judge.

On June 21, 2002, a federal grand jury sitting in Harrisburg, Pennsylvania issued a thirty-seven count indictment against Defendants Grass and Brown, former officers and directors for the Rite Aid Corporation.[1] The indictment alleges that Defendants engaged in a conspiracy intended to enrich themselves by defrauding Rite Aid and its stockholders, creditors, and vendors. This conspiracy allegedly lasted the duration of Defendant Grass's tenure as Rite Aid's Chief Executive Officer ("CEO"). The indictment also alleges that Defendants Grass and Brown engaged in a conspiracy to obstruct justice by impeding investigations by the United States Securities and Exchange Commission ("SEC"), the Federal Bureau of Investigation ("FBI"), the United States Attorney's Office for the Middle District of Pennsylvania, and the Grand Jury.

On September 4, 2002, Defendants Grass and Brown filed a motion to suppress tapes of conversations that they had with Timothy Noonan, Rite Aid's former President. Defendants contend that Assistant United States Attorney Kim Douglas Daniel obtained the recorded conversations in violation of Rules 4.2 and 8.4(a) of the Pennsylvania Rules of Professional Conduct. Following the submission of briefs, the court conducted a suppression hearing on December 20, 2002. The motion is now ripe for disposition.

### I. *Findings of Fact*

Most of the facts pertinent to this motion are not in dispute. Defendant Grass resigned as Rite Aid's CEO on October 18, 1999. Shortly thereafter, Rite Aid's new corporate leadership launched an internal investigation into allegations of fraudulent misconduct during Defendant Grass's tenure as CEO. In December of 1999, the SEC launched its own civil investigation into these same allegations. Around that same time, the FBI's field office in Harrisburg, Pennsylvania began an investigation in conjunction with the United States Attorney's Office for the Middle District of Pennsylvania. The Government assigned FBI Agent George Delaney and Assistant United States Attorney ("AUSA") Kim Douglas Daniel to lead its criminal investigation.

At the suppression hearing, Noonan testified that between October of 1999 and July of 2000 he met with Defendant Brown several times. During those meetings, the two men discussed what each would tell Rite Aid's internal investigators regarding the fraud allegations. Both men were aware, during this period, that both civil and criminal investigations were pending as well.

On February 12, 2001, AUSA Daniel phoned Defendant Brown's counsel at the time, Herbert Stern.[2] During that conver-

---

**1.** The indictment also contains charges against a current Rite Aid Vice President, Eric Sorkin, and Rite Aid's former Chief Financial Officer, Franklyn Bergonzi. However, nei-

ther Bergonzi, nor Sorkin, are parties to this motion.

**2.** Herbert Stern is a former United States District Court Judge for the District of New

sation, the two agreed that the Government would interview Defendant Brown on April 4, 2001. Mister Stern, however, requested that the Government provide, in advance of the interview, an agenda listing the topics that would be discussed. On March 28, 2001, AUSA Daniel faxed Mr. Stern an agenda letter setting forth the topics that the parties would discuss during the interview. No later than March 30, 2001, Mr. Stern informed AUSA Daniel that Defendant Brown had changed his mind and would not consent to an interview.

Previously, on March 9, 2001, Noonan met with AUSA Daniel and Agent Delaney at the United States Attorney's Office in Philadelphia, Pennsylvania. During that meeting, the parties discussed the fraud allegations and any contact that Noonan may have had with Defendants Grass and Brown subsequent to Noonan's departure from Rite Aid in December of 1999. The following day, Defendant Brown called Noonan at his home requesting that the two meet. Noonan deferred the meeting until March 13, 2001. In the meantime— on either March 11 or March 12, 2001— Noonan contacted Agent Delaney and informed him of Brown's phone call.

On March 13, 2001, Noonan met with Agent Delaney and an unidentified FBI "technical person." (Transcript of Suppression Hearing, Dec. 20, 2002 [hereinafter "Tr."] at p. 24, Ins. 8–9.) During that meeting, Noonan agreed to surreptitiously record his conversation with Brown. In preparation for the meeting, Agent Delaney instructed Noonan to steer the conversation with Defendant Brown towards the same subjects listed on the Government's agenda letter to Brown's attorney. After his meeting with Agent Delaney, Noonan met with Defendant Brown at a

restaurant in Mechanicsburg, Pennsylvania. Their conversation was recorded by a hidden microphone attached to Noonan's body. During that meeting, Defendant Brown informed Noonan that he would be meeting with the Government in early April. Defendant Brown also told Noonan that Defendant Grass had retained Attorney William Jeffress to represent him in any criminal proceedings that might occur.

Between March 13 and March 30, 2001, Noonan met again with Agent Delaney in Philadelphia. At some point, either during the meeting in Philadelphia or during a subsequent phone conversation, the two discussed several issues related to the Rite Aid investigation and whether Noonan was willing to become an undercover agent for the Government. Noonan agreed. Agent Delaney then instructed Noonan to meet with Defendant Brown again and to engage him in conversations relevant to the fraud allegations. Agent Delaney also gave Noonan a fake letter signed by AUSA Daniel and addressed to Attorney David Howard, Noonan's retained counsel. That document was similar in content to the agenda letter that AUSA Daniel had already sent to Mr. Stern regarding Defendant Brown's proposed interview. Agent Delaney instructed Noonan to use the letter as a prop to guide his conversation with Brown to the topics listed in the letter. However, Agent Delaney warned Noonan to avoid talking about Defendant Brown's conversations with his attorney. (*See* Tr. at p. 44, Ins. 6–9 ("[Agent Delaney] did say that if Franklin brought up or said he had this discussion with his attorney or that discussion or that these were topics that his attorney said, don't get into those conversations.").)

Jersey. Hereinafter the court will refer to Judge Stern as "Mr. Stern" in order to avoid

confusion between his title as a federal judge and his role as counsel in the instant matter.

After this meeting, Noonan called Brown and told him that he wanted to get together and talk on March 30, 2001. As stated above, by March 30, 2001, Brown's attorney had cancelled the Government's interview of Defendant Brown. In any event, Noonan met Defendant Brown on March 30, 2001 at a different restaurant in Mechanicsburg. During their conversation, Noonan, as instructed, showed Defendant Brown the prop letter and attempted to engage him in conversation regarding the subjects listed in the letter. As with their meeting on March 13, 2001, Noonan wore a wire that recorded the conversation.

On April 1, 2001, Defendant Brown called Noonan and "said that he wanted to get together." (Tr. at p. 18, ln. 14.) Noonan agreed and immediately called Agent Delaney who arranged to have Noonan wired. Noonan then met with Brown again and, as before, recorded their conversation for the Government.

On either April 16 or April 18, 2001, Noonan, at Agent Delaney's behest, traveled to Defendant Grass's office in Lemoyne, Pennsylvania to attempt to record a conversation with Grass regarding the fraud allegations.[3] Defendant Grass, however, was not in his office.

Following this attempted meeting, Noonan met once again with Agent Delaney in Philadelphia. During this meeting, Delaney instructed Noonan to meet with Defendant Brown again to arrange for a meeting with both Defendants Brown and Grass. On April 27, 2001, Noonan and Defendant Brown met at the Hampden Center Shopping Mall in Mechanicsburg, Pennsylvania. As before, Noonan record-

ed the conversation. During the course of the meeting, Noonan, as instructed, requested an audience with Defendant Grass. Defendant Brown indicated that Defendant Grass would probably be amenable to such a meeting.

On May 1, 2001, Noonan met with Agent Delaney, another unidentified FBI agent, AUSA Daniel, and AUSA George Rocktashel at the Federal Building in Harrisburg. Although AUSA Daniel was aware of Noonan's cooperation, this marked the first time he and Noonan had spoken since Noonan's initial interview on March 9 in Philadelphia. Their conversation covered a wide variety of subjects relating to the Government's investigation of fraud at Rite Aid and what Noonan's conversations with Brown had unveiled. Noonan also informed AUSA Daniel that he would soon be meeting with both Defendants Grass and Brown. AUSA Daniel then delineated the topics that he wished to have Noonan raise during that meeting. Following his two to three hour meeting with the Government officials, Noonan jotted down on a sheet of paper notes regarding what topics AUSA Daniel wanted Noonan to discuss with Defendants Brown and Grass.

The following day, May 2, 2001, Noonan met with Defendants Grass and Brown at Grass's office. Once again, the Government recorded the conversations through a hidden microphone worn by Noonan. During the course of this meeting, Noonan removed his notes from his pocket and used them to guide the conversation. Noonan told Defendants Grass and Brown that the notes were taken during Noonan's meeting with the Government in Philadelphia in March of 2001. Following the

---

**3.** As he did before Noonan's meeting with Defendant Brown, Agent Delaney instructed Noonan to stay clear of the substance of Defendant Grass's conversations with his attorney. (*See* Transcript at p. 60, lns. 15–18

("[Agent Delaney] said if they start talking about their lawyers or conversations with their lawyers, I don't want you to get into any conversation. He said that to me.").)

meeting with Grass and Brown, Noonan met with AUSA Daniel. Noonan subsequently threw the notes away.

After the May 2, 2001 meeting, Defendant Brown called Noonan and stated: "That he would like to get together." (Tr. at p. 78, ln. 15.) Noonan and Brown met for the last time on May 21, 2001. As with the other conversations, the Government surreptitiously recorded this conversation through a wire that Noonan was wearing.

Although AUSA Daniel only met with Noonan twice, he approved the recording of each conversation. It is undisputed that at the times he authorized these recordings, AUSA Daniel knew that Defendants Grass and Brown were both represented by counsel. Additionally, it is likewise beyond dispute that, at least with respect to five of the six conversations, AUSA Daniel knew that Defendant Brown had refused to consent to an interview with the Government. Finally, it is also undisputed that neither Defendant was under indictment at the time Noonan recorded their conversations. As stated at the outset of this memorandum, the indictment in this case did not issue until June 21, 2002.

## II. Conclusions of Law

In the instant motion, Defendants argue that AUSA Daniel violated Rules 4.2 and 8.4(a) of the Pennsylvania Rules of Professional Conduct by using a surrogate to communicate with parties whom he knew to be represented by counsel. Thus, according to Defendants, the tapes of these conversations should be suppressed pursuant to the court's inherent supervisory power. For the following reasons, the court will deny Defendants' motion: (1) AUSA Daniel did not violate the Rules of Professional Conduct; and (2) even if he did violate those rules, suppression of the evidence is not an appropriate remedy under the facts in this case.

### A. AUSA Daniel did not violate the Pennsylvania Rules of Professional Conduct.

■ Rule 4.2 of the Pennsylvania Rules of Professional Conduct, also known as the "no-contact rule," prohibits an attorney from communicating "about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so." Rule 8.4(a) states that it is professional misconduct for an attorney to knowingly assist another in violating the rules of professional conduct. Defendants argue that the tapes of the conversations between Noonan and Defendants must be suppressed because AUSA Daniel violated Rule 4.2. According to Defendants, AUSA Daniel employed Noonan as his surrogate to communicate with Defendants after AUSA Daniel knew that Defendants had retained counsel; thus, violating Rule 8.4(a).

In order to prevail on this motion, Defendants must demonstrate the following. First, AUSA Daniel violated Rule 4.2. Second, Defendants were represented by counsel at the time the statements were elicited. Third, suppression is an appropriate remedy for violation of the Rule. *See United States v. Veksler,* 62 F.3d 544, 548 (3d Cir.1995).

In the past, significant debate surrounded the issue of whether state rules of professional responsibility apply at all to federal prosecutors. *See United States v. Talao,* 222 F.3d 1133, 1139–40 (9th Cir. 2000). However, in 1998, Congress eliminated all doubt regarding this issue by enacting what is commonly referred to as the McDade Amendment. *See* 28 U.S.C. § 530B. The McDade Amendment states, in relevant part: "An attorney for the [Federal] Government shall be subject to

State laws and rules ... governing attorneys in each State where such attorney engages in that attorney's duties, to the extent and in the same manner as other attorneys in that State." *Id.* at § 530B(a).

Therefore, it is beyond doubt that AUSA Daniel was bound by the Pennsylvania Rules of Professional Conduct at all times relevant to the instant motion.[4] Furthermore, based on Rule 8.4(a) of the Rules of Professional Conduct, AUSA Daniel could not avoid the dictates of Rule 4.2 by employing Noonan as his surrogate to accomplish what he himself could not do without violating the Rules of Professional Conduct. However, it remains to be seen whether AUSA Daniel's conduct in this case violated Rule 4.2. Although the McDade Amendment makes clear that state rules of professional conduct apply to Government attorneys, that legislation does not define what those standards are, when they attach, or what is an appropriate remedy to impose if Government lawyers breach those rules. Instead, it is completely silent as to these matters.

The Government argues that AUSA Daniel did not violate Rule 4.2 because (1) neither Defendants Grass, nor Brown, were a "party," as no indictment had issued at the time Noonan recorded the conversations, and (2) even if either Defendant Grass or Brown were a "party," the communications were "authorized by law," as that term is used in the no-contact rule. Pa. R. Prof'l Conduct 4.2. In support, the Government cites the Third Circuit's decision in *United States v. Balter,* 91 F.3d 427 (3d Cir.1996). In this pre-McDade Amendment case, the Third Circuit affirmed the District Court's refusal to suppress recordings of non-custodial conversations between a Government agent and the

defendant made after the Government learned that the defendant was represented by counsel. *Id.* at 436.

The Circuit Court's holding in that case was based on the identical two-prong argument that the Government proffers in opposition to the instant motion. That is, first, the court held that the Government did not violate the no-contact rule because the agent recorded the conversations prior to the defendant's indictment. Therefore, at that time, the defendant was not a party. *See id.* Second, even if the defendant were a party, the court held that the communications fell within Rule 4.2's "authorized by law" exception. *See id.*

It is important to note that, in *Balter,* the court addressed whether the Government violated the no-contact rule as that rule appears in the New Jersey Rules of Professional Conduct. Crucial to the court's holding that the defendant was not a "party," as that term is used in the rule, was the fact that courts interpreting the New Jersey no-contact rule had concluded that it does not attach until after initiation of formal legal or adversarial proceedings. *See id.; see also State v. CIBA–GEIGY Corp.,* 247 N.J.Super. 314, 589 A.2d 180, 183 (App.Div.1991) (holding that a criminal suspect is not a party until "after formal legal or adversarial proceedings have commenced"). This portion of the *Balter* holding is, therefore, inapplicable to the instant case. Although the Pennsylvania and New Jersey no-contact rules employ virtually identical language, there is no caselaw limiting application of the Pennsylvania no-contact rule to post-indictment contacts. In fact, the commentary to Pennsylvania Rule 4.2 states the contrary: "This Rule covers any person, whether or not a party

---

4. The Pennsylvania Rules of Professional Conduct are applicable to all actions brought in the United States District Court for the Middle District of Pennsylvania. *See* M.D. Pa. Local Rule 83.23.2.

to a formal proceeding, who is represented by counsel concerning the matter in question." Pa. R. Prof'l Conduct 4.2 official comment. Therefore, it is clear that, at the time of the recorded conversations, Defendants Grass and Brown were parties as that term is contemplated in Rule 4.2 of the Pennsylvania Rules of Professional Responsibility.

However, this does not, as Defendants contend, automatically lead to the conclusion that AUSA Daniel violated the no-contact rule by employing Noonan as his alter ego to communicate with Defendants. Rule 4.2 does not prohibit all contact between attorneys and parties represented by counsel. Rather, that rule specifically makes an exception for those contacts which are "authorized by law." Pa. R. Prof'l Conduct 4.2. In fact, the *Balter* court specifically held that the person-party distinction under the New Jersey no-contact rule was irrelevant to its holding that the Government did not violate the rule because "even if a criminal suspect were a 'party' within the meaning of the rule, pre-indictment investigation by prosecutors is precisely the type of contact exempted from the Rule as 'authorized by law.'" 91 F.3d at 436. Therefore, *Balter* makes clear that pre-indictment non-custodial interrogations by Government agents do not violate the no-contact rule because such contacts are authorized by law.

With the exception of the Second Circuit, every other court of appeals that has considered the issue has similarly held that the no-contact rule does not prevent non-custodial pre-indictment communications by undercover agents with represented parties which occur in the course of legitimate criminal investigations. *See United States v. Ryans,* 903 F.2d 731, 739 (10th Cir.1990) ("We agree with the majority of courts which have considered the question that [the no-contact rule] was not intended to preclude undercover investigations of unindicted suspects merely because they have retained counsel."); *United States v. Sutton,* 801 F.2d 1346, 1366 (D.C.Cir.1986) (citing *United States v. Lemonakis,* 485 F.2d 941, 956 (D.C.Cir. 1973) ("Here, in the investigatory stage of the case, the contours of the "subject matter of the representation" by appellants' attorneys, concerning which the code bars "communication," were less certain and thus even less susceptible to the damage of "artful" legal questions the Code provisions appear designed in part to avoid.")); *United States v. Dobbs,* 711 F.2d 84, 86 (8th Cir.1983) ("Assuming that [the no-contact rule applies] ... it does not require government investigatory agencies to refrain from any contact with a criminal suspect because he or she has retained counsel.... [The Government agent's] noncustodial interview of Dobbs prior to the initiation of judicial proceedings against the appellant did not constitute an ethical breach.").[5]

---

5. Although each of these cases was decided prior to the enactment of the McDade Amendment, the court cannot see how their reasoning regarding the "authorized by law" exception to the no-contact rule would be altered by legislation making state rules of professional responsibility applicable to Federal prosecutors. Reading the McDade Amendment to eliminate the "authorized by law" language in the no-contact rule contravenes fundamental principals of statutory construction. *See Connecticut Nat'l Bank v. Germain,* 503 U.S. 249, 253–54, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992) (holding that the principal canon of statutory construction is that words are to be given their ordinary meaning); *United States v. Menasche,* 348 U.S. 528, 538–39, 75 S.Ct. 513, 99 L.Ed. 615 (1955) (stating that where the statutory language is clear on its face, courts are to give it full force and effect). Therefore, the casclaw interpreting the "authorized by law" language in the no-contact rule applies with as much force today as it did before enactment of the McDade Amendment.

Moreover, such a reading is consistent with the intentions of the authors of the original no-contact rule. The commentary to American Bar Association Model Rule of Professional Responsibility 4.2 states the following:

> Communications authorized by law also include constitutionally permissible investigative activities of lawyers representing governmental entities, directly or through investigative agents, prior to the commencement of criminal or civil enforcement proceedings, when there is an applicable judicial precedent that either has found the activity permissible under this Rule or has found this Rule inapplicable. However, the Rule imposes ethical restrictions that go beyond those imposed by constitutional provisions.

Model Code of Prof'l Conduct R. 4.2 cmt. 2 (1983).

Because there is caselaw indicating that AUSA Daniel's pre-indictment investigation was permitted pursuant to the no-contact rule, according to the commentary to the Model Rule, his conduct was "authorized by law" so long as it was constitutionally permissible. Defendants do not contend that the Government's actions here violated their Fifth or Sixth Amendment rights to have counsel present. Nor could they present a credible argument regarding either. Noonan's interrogation, if any, did not take place in a custodial setting nor were Defendants compelled to speak to Noonan. Thus, Defendants' Fifth Amendment right to counsel was not implicated. *See Hoffa v. United States,* 385 U.S. 293, 303–04, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966) (holding that a "necessary element of compulsory self-incrimination is some kind of compulsion"); *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) (holding procedural safeguards are necessary in order to use

statements obtained from a criminal defendant during *custodial* interrogation). Additionally, Noonan recorded the conversations with Defendants before the initiation of adversarial proceedings; placing those contacts outside the scope of the Sixth Amendment right to counsel. *United States v. Henry,* 447 U.S. 264, 269, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980) (holding that the Sixth Amendment right to counsel attaches upon the initiation of the " 'critical stages' of the prosecution"). Nor is there any allegation that AUSA Daniel authorized Noonan to engage in more egregious conduct which might constitute a due process violation. *See, e.g., United States v. Twigg,* 588 F.2d 373, 377–78 (3d Cir.1978) (finding violation of due process where law enforcement officials, in the context of an undercover drug investigation, "conceived and contrived" the crime for which the defendant was convicted) Thus, because AUSA Daniel's conduct did not violate Defendants' constitutional rights, in addition to the fact that there is a significant body of caselaw indicating that such conduct is not prohibited by the no-contact rule, it must be that his conduct was "authorized by law." Pa. R. Prof'l Conduct 4.2.

In support of their contention that AUSA Daniel violated Rule 4.2, Defendants rely primarily on the Second Circuit's decision in *United States v. Hammad,* 858 F.2d 834 (2d Cir.1988). In that case—on facts somewhat similar to those in the instant matter—the court initially rejected the Government's contention that the no-contact rule only applied to the same extent as the Sixth Amendment right to counsel; *i.e.* only upon the initiation of formal legal proceedings. *Id.* at 839 ("[W]ere we to construe the rule as dependent upon indictment, a government attorney could manipulate grand jury proceedings to avoid its encumbrances."). Having determined that the no-contact rule applied to the Government attorney's pre-

indictment conduct, the court went on to hold that, normally, the no-contact rule would not serve to prevent the Government from using confidential informants to elicit incriminating statements from parties that the Government knows to be represented by counsel. The court, however, went on to state the following:

> Notwithstanding this holding, however, we recognized that in some instances a government prosecutor may overstep the already broad powers of his office, and in doing so, violate the ethical precepts of [the no-contact rule]. In the present case, for example, the prosecutor's use of a counterfeit grand jury subpoena, bearing the purported seal of the district court and the false signature of the Clerk, was an improper and illegitimate stratagem. We will not countenance such a misuse of the name and power of the court. The employment of a specious and contrived subpoena is the sort of egregious misconduct that, even before the 6th amendment protections attach, violates [the no-contact rule]. . . .
>
> Notwithstanding requests for a bright-line rule, we decline to list all possible situations that may violate [the no-contact rule]. . . . As our holding above makes clear, however, use of informants by government prosecutors in a pre-indictment, non-custodial situation, *absent the type of egregious misconduct that occurred in this case,* will generally fall within the "authorized by law" exception to [the no-contact rule] and therefore will not be subject to sanctions.

*Id.* at 839–40 (emphasis added).

Thus, it appears that the court, in *Hammad,* was more concerned with curbing prosecutorial skullduggeries than it was with preventing the use of government informants to obtain incriminating statements from parties represented by counsel in the pre-indictment non-custodial setting.

Defendants, however, argue that the no-contact rule bars the introduction of the Noonan tapes because "[t]he facts in *Hammad* almost precisely parallel the facts of this case." (Defs. Br. in Sup. Mot. to Suppress Noonan Tapes at 16.) Like the Government attorney in *Hammad,* AUSA Daniel used fake documents and had his informant falsely indicate to the targets of the investigation that the informant himself was still under investigation. Thus, according to Defendants, "Daniel's actions are clear cut violations of Rules 4.2 and 8.4(a)." (*Id.* at 17.)

The court disagrees both with Defendants' interpretation of the facts in this case and the weight it gives to the *Hammad* decision. Although the Second Circuit, in *Hammad,* held that the use of fake documents places a prosecutor's conduct outside of the authorized by law exception to the no-contact rule, that portion of the *Hammad* decision is inapplicable in the instant matter. First, AUSA Daniel did not employ a counterfeit grand jury subpoena bearing the forged signature of the Clerk of Court as the Government prosecutor in *Hammad* did. Instead, AUSA Daniel simply drew up a fake agenda letter addressed to Noonan's attorney and signed by AUSA Daniel himself. This document was fake only insofar as there was no pending interview between the Government and Noonan scheduled for April of 2001, as indicated in the letter. By the time AUSA Daniel had written this letter, Noonan was already cooperating with the Government. At the hearing, Noonan testified that the Government fabricated the letter for Noonan to use during his meeting with Defendant Brown. Although preparing and presenting such a letter to an unwitting criminal suspect involves a certain level of dishonesty, it certainly does

not rise to the level of employing a sham grand jury subpoena. *See United States v. Murphy*, 768 F.2d 1518, 1529 (7th Cir. 1985) ("In the pursuit of crime, the Government is not confined to behavior suitable for the drawing room. It may use decoys and provide the essential tools of the offense.") Second, even if the court were to find that this practice was equivalent to the prosecutor's actions in *Hammad*, the Third Circuit has long held that the use of a fabricated grand jury subpoena "to protect a cover in an ongoing undercover investigation" does not constitute prosecutorial misconduct. *United States v. Martino*, 825 F.2d 754, 762 (3d Cir. 1987). Given that the holding in *Hammad* explicitly relied on the finding of prosecutorial misconduct, the court finds its applicability to the instant matter limited based on the fact that no prosecutorial misconduct occurred here.

Defendants also argue that a finding that AUSA Daniel's conduct in this case is "authorized by law" would allow the exception to swallow Rule 4.2's prohibition against contact with represented parties. Moreover, according to Defendants, such a ruling would eviscerate the purpose of the McDade amendments; that is, making the no-contact rule explicitly applicable to the conduct of Government attorneys. In support of their position, Defendants cite the following passage from *United States v. Lopez*, 765 F.Supp. 1433 (N.D.Cal.1991):

> Were this court to accept the Department's argument in this regard, it is not clear that there would *any* conduct the prosecutor could not undertake, as long as it was pursuant to his or her responsibility to investigate and prosecute crimes. [Department of Justice] attorneys would be exempt from rules adopted by federal courts to govern ethical conduct of attorneys practicing before them. This, quite simply, is an unacceptable result.

*Id.* at 1448 (emphasis in original).

*Lopez*, however, is readily distinguishable from the facts in this case. That case involved multiple defendants who had already been indicted on various drug charges. Apparently, an attorney for one of Lopez's co-defendants contacted Lopez and encouraged him to engage in plea negotiations with the Government without having his attorney present. Once these protracted negotiations broke down and the Government's conduct came to light, Lopez's attorney withdrew from the case. Lopez subsequently moved to have the indictment dismissed because, he alleged, the Government attorney violated the no-contact rule. *Id.* at 1438–44. The District Court agreed and granted the motion. In doing so, it made two specific holdings. First, attorneys representing the Federal Government are not exempt from state rules of professional responsibility. *See id.* at 1488 ("Without an ethical restraint, a prosecutor's authority to communicate with represented individuals would be virtually limitless."). Second, post-indictment contacts by Government attorneys are not "authorized by law." *See id.* at 1450 ("Given the above discussion, the court finds that [the no-contact rule] ... appl[ies] to DOJ attorneys, at least in the post-indictment phase of criminal investigations and prosecutions."). *But see id.* at 1448 (recognizing that "Department attorneys are authorized to communicate with represented individuals without their attorney only in the pre-indictment context ... and where specific procedural rules authorize the government conduct"). The first of these holdings is unexceptional after the enactment of the McDade Amendment. The second is irrelevant to the instant matter because it is beyond dispute that Defendants were not indicted until well over a year after Noonan's last recording

took place. Therefore, to the extent Defendants rely on *Lopez* for the proposition that it would impermissibly stretch the no-contact rule to hold that the Government's conduct in this case was authorized by law, the court finds that *Lopez* is neither instructive, nor relevant to that point.[6]

The McDade Amendment's lone function was to make state rules of professional responsibility applicable to the conduct of Government attorneys. That legislation did not state what those rules were, nor did it amend the well-established contours of those rules. Therefore, as it applies in this case, the McDade Amendment makes it clear only that Rules 4.2 and 8.4(a) applied to AUSA Daniel's conduct. Those rules prohibit attorneys, or their agents, from contacting parties that are represented by counsel unless such contact is authorized by law. As previously stated, AUSA Daniel's conduct was authorized by law and, thus, did not violate the Pennsylvania Rules of Professional Conduct. Defendants, however, contend that such a reading would allow the exception to swallow the rule, thus weakening the purpose behind the McDade Amendment. However, Defendants fail to recognize that the exception is part and parcel of Rule 4.2. Therefore, the McDade Amendment made the entire Rule 4.2, including the authorized by law exception, applicable to the conduct of Government attorneys. To adopt Defendants' argument would be tantamount to reading the McDade Amendment as amending all fifty states' rules of professional responsibility as they apply to Government attorneys. Absent a clear indication from Congress that it intended to do so, the court will not read such an awesome power into the McDade Amendment's humble command that attorneys for the Government "shall be subject to State laws and rules ... governing attorneys in each State ... to the extent and in the same manner as other attorneys in that State." 28 U.S.C. § 530B(a).

Moreover, reading the McDade Amendment according to Defendants' interpretation raises serious public policy concerns regarding the fairness of the judicial system. It is axiomatic that criminal defendants' trial rights should not depend on the extent of their financial resources. *See, e.g., Powell v. Alabama,* 287 U.S. 45, 65, 53 S.Ct. 55, 77 L.Ed. 158 (1932) (holding, *inter alia,* that appointment of counsel for impecunious defendants is necessary to comply with requirements of due process). Yet, adopting a rule that the McDade Amendment prohibits the Government from contacting any person known to be represented by counsel in any way whatsoever, will insulate from undercover investigation any defendant with enough financial resources to permanently obtain private counsel. Such a rule would dramatically

---

**6.** Defendants also rely on the District of New Mexico's lengthy quotation of *Lopez* in support of their contention that construing the no-contact rule to allow pre-indictment non-custodial interrogation with represented parties would sap the McDade Amendment of its power. *See In re Doe,* 801 F.Supp. 478 (D.N.M.1992). However, insofar as that case addresses the no-contact rule, it stands for the singular proposition that the rule applies to Federal prosecutors; a matter beyond debate in the post-McDade Amendment world. *Id.* at 486–87. Even if the court were to import from this holding that *Doe* stands for the broader proposition that pre-indictment non-custodial contacts by undercover Government agents violates the no-contact rule, such a holding would be mere *dicta.* The court in *Doe* did not make a finding of unethical conduct on the part of the Government attorney which necessitated sanctioning the attorney by, for example, suppressing evidence or dismissing an indictment. Instead, the court merely granted the State of New Mexico's motion to remand the action to the Disciplinary Board of the New Mexico State Supreme Court. *Id.* at 489.

impugn the integrity of the judiciary; not to mention the crippling effect it would have on the Government's ability to investigate on-going criminal activity. Although Defendants argue that such a contention is irrelevant, it would ignore reality to deny the very real consequences that Defendants' interpretation would have on the day-to-day administration of justice.

### B. Assuming that AUSA Daniel violated the no-contact rule, suppression of the Noonan tapes is an inappropriate remedy.

■ Even assuming that the court were to find that AUSA Daniel violated Rule 4.2 of the Pennsylvania Rules of Professional Conduct, the court doubts that suppression of the Noonan tapes is a proper remedy for such a violation. The Supreme Court first countenanced the exclusion of otherwise relevant and probative evidence as a remedy for police conduct that violated a criminal defendant's Fourth Amendment rights. *See Weeks v. United States*, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914); *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). In this line of cases, the Court found that "the [exclusionary] rule's prime purpose is to deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures." *United States v. Calandra*, 414 U.S. 338, 347, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974). The Court, however, has "consistently recognized that unbending application of the exclusionary sanction to enforce ideals of governmental rectitude would impede unacceptably the truth-finding functions of judge and jury." *United States v. Payner*, 447 U.S. 727, 734, 100 S.Ct. 2439, 65 L.Ed.2d 468 (1980). Thus, the exclusion of otherwise admissible evidence is sanctioned only where the need to curb Government misconduct outweighs the public's very substantial right to every

man's evidence. *Elkins v. United States*, 364 U.S. 206, 216, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960) ("[A]ny apparent limitation upon the process of discovering truth in a federal trial ought to be imposed only upon the basis of considerations which outweigh the general need for untrammeled disclosure of competent and relevant evidence in a court of justice.").

In addition to its power to exclude evidence as a remedy for constitutional violations, the Court has long endorsed the idea that federal courts also have the inherent supervisory power to exclude "evidence taken from the defendant by 'willful disobedience of law.'" *McNabb v. United States*, 318 U.S. 332, 345, 63 S.Ct. 608, 87 L.Ed. 819 (1943); *accord Payner*, 447 U.S. at 735 n. 7, 100 S.Ct. 2439; *Elkins*, 364 U.S. at 223, 80 S.Ct. 1437; *Rea v. United States*, 350 U.S. 214, 216–17, 76 S.Ct. 292, 100 L.Ed. 233 (1956). Under their supervisory power, federal courts may exclude evidence even where the Government has not violated the Constitution. *United States v. Hogan*, 712 F.2d 757, 761 (2d Cir.1983). The supervisory power to exclude evidence, however, should only be imposed to serve three purposes: (1) to remedy violations of a particular defendant's right; (2) to preserve judicial integrity; and (3) to deter illegal or improper conduct on the part of Government attorneys and other law enforcement personnel. *United States v. Hasting*, 461 U.S. 499, 505, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983) (internal citations omitted). Therefore, in order to determine whether exclusion would be proper in this case, the court must determine whether the need to effectuate any of the these purposes outweighs the Government's right to present the Noonan tapes for the jury's consideration at trial. The court, therefore, now turns to Rule 4.2 to examine whether the princi-

pals embodied by it would be furthered by suppression of the Noonan tapes.

"Courts and commentators have noted that Rule 4.2 is designed 'to prevent situations in which a represented party may be taken advantage of by adverse counsel; the presence of the party's attorney theoretically neutralizes the contact.'" *University Patents, Inc. v. Kligman,* 737 F.Supp. 325, 327 (E.D.Pa.1990) (quoting *Frey v. Department of Health and Human Servs.,* 106 F.R.D. 32, 34 (E.D.N.Y. 1985)). "The prohibition against communication with a represented party thus recognizes the inherent danger in a layperson conducting negotiations with an opposing lawyer and the likelihood that such negotiations would destroy the confidence essential to the attorney-client privilege and hamper the subsequent performance of the represented party's counsel." *Lopez,* 765 F.Supp. at 1449; *accord United States v. Batchelor,* 484 F.Supp. 812, 813 (E.D.Pa. 1980).

Thus, the primary purpose of the no-contact rule is to prevent an attorney from intentionally tricking an opposing party into waiving the protections of the attorney-client relationship; presumably the confidentiality of attorney-client communications and trial strategies. As a result, if the court were to order the suppression of the Noonan tapes, it could do so to remedy Defendants' right to confidentially communicate with their attorneys. The court finds that suppression would not vindicate the confidentiality of Defendants' relationship because Defendants placed the confidentiality in jeopardy by communicating with an independent party.

"The attorney-client privilege protects confidential communications made to an attorney in his or her professional capacity in those instances in which a strict relationship between the attorney and the client exists." *In re Grand Jury (OO-2H),* 211 F.Supp.2d 555, 557–58 (M.D.Pa. 2001) (citing *Haines v. Liggett Group, Inc.,* 975 F.2d 81, 94 (3d Cir.1992)). The confidentiality of this relationship is protected "to ensure that a client remains free from apprehension that consultations with a legal adviser will be disclosed." *Rhone–Poulenc Rorer, Inc. v. Home Indem. Co.,* 32 F.3d 851, 862 (3d Cir.1994). Such concerns are not implicated where, as in the instant matter, a client voluntarily consults a third party regarding matters essential to the client's case. *See United States v. Moscony,* 927 F.2d 742, 752 (3d Cir.1991) ("It is generally true that if the client intended the matter to be made public, the requisite confidentiality is lacking." (internal quotations omitted)); *see also* Edna Selan Epstein, American Bar Association Section of Litigation, The Attorney–Client Privilege and the Work–Product Doctrine 171 (4th ed. 2001) ("To be privileged, a communication must be made with the intention of being kept confidential.").

The fact that Defendants erroneously believed that they were consulting with a friendly ear, rather than a Government agent, does not change this analysis. Put another way, although Defendants could not have reasonably known that the Government was monitoring their conversations with Noonan, they likewise could not have reasonably believed that they were communicating with their attorneys at the time the three men decided to meet to discuss matters related to the various investigations arising out of their tenures as Rite Aid officers. Defendants waived the confidential nature of this information by divulging it to Noonan because he was not their attorney. Defendants cannot now cry out that the sacrosanct nature of their confidential relationship with their attorneys has been usurped by improper Government stratagem when they themselves intentionally caused confidential informa-

tion to be divulged to a third party whom they knew was not connected to the defense of any case that might be brought against them.[7] Because the undisputed facts indicate that Defendants demonstrated a willingness to share information with a person who was not one of their attorneys, the court cannot say that the Government's conduct caused a violation of Defendants' right to confidentially communicate with their attorneys. Thus, the purpose behind the no-contact rule—*i.e.* the protection of the confidential nature of the attorney-client relationship—would not be vindicated by suppression of the Noonan tapes.[8]

Likewise, the court finds that suppression in this case would do little to deter illegal or improper conduct on the part of Government attorneys.[9] Even if the court were to find that AUSA Daniel violated Rule 4.2—although the court specifically has not done so—it cannot say that his conduct, nor that of his collogues at the United States Attorney's office, was so egregious that the court should punish the Government by preventing it from presenting the fruits of its investigation. Contrary to Defendants' assertion, the facts presented do not "illustrate a deliberate attempt by the prosecutor to flout Rule 4.2 by using informant Noonan as an 'alter ego' to interview Grass and Brown about the facts under investigation." (Defs. Reply Br. at 19.) Rather, the facts indicate that the Government believed, in good faith, that their conduct did not violate Rule 4.2. The McDade Amendment is a

new creature. The breadth of its reach had yet to be tested when the Government came to the not unreasonable conclusion that its long-endorsed investigatory practice of using undercover agents to procure information from represented parties remained unaffected. Even if this assumption turned out to be erroneous, the court cannot say that the Government acted with a willfulness to flout its responsibility to refrain from contacting parties represented by counsel.

In addressing whether exclusion is required for violation of the Fourth Amendment, "[t]he Court has acknowledged that the suppression of probative but tainted evidence exacts a costly toll upon the ability of courts to ascertain the truth in a criminal case." *Payner*, 447 U.S. at 734, 100 S.Ct. 2439 (citations omitted). "As with any remedial device, the application of the rule has been restricted to those areas where its remedial objectives are thought most efficaciously served." *Calandra*, 414 U.S. at 348, 94 S.Ct. 613. Accordingly, where a law enforcement official objectively relies in good faith upon misinformation, the deterrent effect of the exclusionary rule is too attenuated to require suppression of otherwise admissible evidence. *See United States v. Leon*, 468 U.S. 897, 922, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) ("We conclude that the marginal or nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the

---

7. It is worth noting that Defendant Brown initiated contact with Noonan and that he made the necessary arrangements for the meeting between himself, Noonan, and Defendant Grass.

8. Moreover, it is worth noting that the Government took aims to protect Defendants' confidential communications with their attorneys. At least twice, Agent Delaney admon-

ished Noonan to avoid conversations regarding what Defendants had communicated to their lawyers. *See supra* at Part I.

9. The Government's actions did not involve the court in any tangible manner. Therefore, the court finds that suppression of the Noonan tapes would do nothing to protect the integrity of the judicial system.

substantial costs of exclusion."); *Michigan v. DeFillippo,* 443 U.S. 31, 40, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979) (denying suppression of evidence obtained in search incident to arrest made in good faith pursuant to a criminal statute later declared unconstitutional). Additionally, the Court has held that deterrence is an inappropriate justification for sanction "where means more narrowly tailored to deter objectionable prosecutorial misconduct are available." *Hasting,* 461 U.S. at 506, 103 S.Ct. 1974 (holding inappropriate reversal of conviction as sanction for prosecutor commenting on the defendant's silence where prosecutor could be referred to attorney discipline board). Although the majority of these holdings addressed whether suppression is an appropriate remedy for violation of the Fourth Amendment, their reasoning is equally persuasive in the present context. *See Payner,* 447 U.S. at 735–36, 100 S.Ct. 2439 (holding that the standards for excluding evidence pursuant to the Fourth Amendment are identical to those for determining exclusion under the courts' supervisory power, "[i]n either case, the need to deter the underlying conduct and the detrimental impact of excluding evidence remain precisely the same").

When the balancing test is applied to the facts in this case, it becomes clear that suppression would be an unduly harsh remedy. Defendants, not the Government, placed the confidentiality of their relationships with their attorneys in jeopardy by divulging information normally protected by the attorney-client privilege to a third-party. Thus, suppression would not vindicate the confidentiality of the attorney-client relationship. Additionally, the Government relied in good faith on the long line of cases holding that pre-indictment non-custodial interrogation with a party represented by counsel is "authorized by law." The McDade Amendment's command that state rules of ethics apply to Government attorneys to the same extent as private attorneys, at best, arguably manifests an intention to eliminate the type of practice used by the Government in this case. Therefore, the court finds that even if the McDade Amendment placed the Government's conduct outside the "authorized by law" exception to the no-contact rule, it did not do so with enough clarity to warrant a finding that the Government acted in bad faith. As such, the court will not order suppression of the Noonan tapes because the deterrent effect of suppression would be, at best, minimal. Moreover, an alternative, and more appropriate remedy, would be for an aggrieved party to file a complaint before the Pennsylvania Disciplinary Board. *See Hasting,* 461 U.S. at 506, 103 S.Ct. 1974.

### III. *Conclusion*

In accordance with the preceding discussion, the court will deny Defendants Grass and Brown's motion to suppress the Noonan tapes. The court finds that AUSA Daniel's conduct in this case was "authorized by law," and thus, did not violate Rule 4.2 of the Pennsylvania Rules of Professional Conduct. Alternatively, the court finds that even if the McDade Amendment effectively banned pre-indictment non-custodial undercover interrogation of represented parties by Government agents, the court finds that AUSA Daniel relied in good faith on prior caselaw upholding such practices. Thus, suppression of the Noonan tapes would be unjustified. An appropriate order will issue.