**UNITED STATES of America**

v.

**Franklin C. BROWN.**

**Criminal No. 1:CR–02–146–02.**

United States District Court,
M.D. Pennsylvania.

Aug. 17, 2004.

Kim Douglas Daniel, U.S. Attorney's Office, Harrisburg, PA, for Plaintiff.

Ellen C. Brotman, John Rogers Carroll, Carroll & Brotman, Philadelphia, PA, Peter Goldberger, Law Office of Peter Goldberger, Ardmore, PA, April A. Oliver, Erik L. Kitchen, Matthew L. Stennes, Reid H. Weingarten, Steptoe & Johnson, LLP, Washington, DC, Joseph U. Metz, Dilworth Paxson LLP, Harrisburg, PA, for Defendant.

## *MEMORANDUM*

RAMBO, District Judge.

On October 17, 2003, following a jury trial, Defendant Franklin Brown was

found guilty on ten counts of a thirty-seven count indictment. After the conviction, the probation office completed its Presentence Investigation Report, which set Defendant's base offense level at six.[1] The probation office calculated that Defendant's base offense level should be adjusted upward by the following enhancements: (1) plus sixteen based on the amount of the loss calculated to be $38,113,383; (2) plus two because the offense involved more than minimal planning; (3) plus four because Defendant was an organizer and leader of the conspiracy to obstruct justice; (4) plus two for an abuse of a position of trust; and (5) plus two for an obstruction of justice enhancement. With enhancements, Defendant's total offense level is thirty-two with a corresponding sentencing range of 121–151 months. Defendant submitted various objections, which, if resolved in his favor, would reduce his total offense level by ten levels.

If Defendant's sentencing had occurred a year ago, the court would be faced with the task of resolving Defendant's objections and calculating an appropriate sentencing guideline range. However, in light of the Supreme Court's recent decision in *Blakely v. Washington*, —— U.S. ——, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), the court's task is not that simple. Accordingly, the court will first address the impact of *Blakely* on Defendant's case.

## I. *Blakely Impact*

█ Quite a lot of ink has been spilt examining the effect of *Blakely* since the case was announced by the Supreme Court on June 24, 2004. The court does not find it necessary to add yet another tome to the universe of *Blakely* decisions where, as here, it is apparent that *Blakely* applies to the facts at hand. In *Blakely,* the Supreme Court ruled that a Washington state sentencing scheme offended the Sixth Amendment to the United States Constitution because it deprived the defendant of his constitutional right to a jury determination. The rule from *Blakely* is that "the 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of facts reflected in the jury verdict or admitted by the defendant.*" *Id* at 2532. That is, a sentence may not be enhanced when doing so requires the judge to make factual findings that go beyond the verdict of the jury. Given this rule, there is no way for the court to sentence Defendant Brown under the federal sentencing guidelines as they are currently written. Accordingly, after careful deliberation, the court concludes that the Guidelines, as applied to this case, are unconstitutional. In so deciding, the court finds *United States v. Croxford*, 324 F.Supp.2d 1230 (D.Utah 2004) to be persuasive and adopts the reasoning therein.

In reaching a sentencing determination, the court will rely on an indeterminate scheme in accordance with the principles set forth in *Croxford* to sentence Defendants. *See id.* at 1246–48.[2] The court

---

1. The parties agree that the 1998 Guidelines apply to Defendant's sentencing calculations.

2. The court notes that the Sentencing Reform Act of 1984 ("the Act") mandates that courts apply the Guidelines to federal sentences. *See* 18 U.S.C. § 3553(b); *see also United States v. Pineiro*, 377 F.3d 464, 470–71 (5th Cir.2004). However, the court concludes that post-*Blakely*, the Guidelines are unworkable.

Defendant argues that the court should sever the offensive portion of the guidelines from the unoffensive portion. However, to sever the enhancements from the Guidelines would flout congressional intent and produce absurd results. *See Croxford*, at 1244–45. The best example of this is the sentence proposed by Defendants: 0–6 months. Such a sentence in a case of this magnitude would not serve the ends of justice.

will, however, make one modification to the *Croxford* court's decision. The court will announce only one sentence based on an indeterminate scheme instead of announcing both an indeterminate sentence and a sentence calculated under the Guidelines. *See id.* at 1251–52. Given the court's conclusion that the Guidelines, as applied to this case, are unconstitutional, a sentence calculated under the Guidelines is not needed.

■ Even though the court will not be issuing an alternative Guidelines sentence, the court finds it useful to resolve Defendant's objections to the presentence investigation report for two reasons. First, doing so allows the court to use what under the Guidelines system are enhancements as a measuring point to evaluate the seriousness of the offenses as well as the particular role that Defendant played in the commission of those offenses. Second, in the event that subsequent developments necessitate the court re-sentencing Defendant under a Guidelines framework, the court will have already reached a decision on these issues. Accordingly, the court will address each of Defendant's objections in turn.

## II. Objections to Presentence Investigation Report

### A. Amount of Loss in Connection with the Zeneca Rebates

Defendant objects to paragraphs 51–53 and consequently paragraphs 97 and 98 of the Presentence Investigation Report. Specifically, Defendant argues that the loss amounts in connection with the Zeneca rebates, approximately $29.6 million, should not be included in Defendant's relevant conduct or Guideline calculation because Defendant's involvement is unsupported by the record as recognized by the jury in the Verdict Slip at item 71.

■ The court finds Defendant's objection to be ill-founded. Section 1B1.3 of the United States Sentencing Guidelines allows the court to consider relevant conduct in determining the appropriate Guideline range. While the court agrees with Defendant that the Jury did not check item 71 on the Verdict Slip, which item referred to the booking of the $29.6 million in Zeneca rebates, there is nonetheless ample evidence suggesting that Defendant knew of these transactions and that it was, at the very least, a reasonably foreseeable act in furtherance of a jointly undertaken activity. For instance, Eric Sorkin testified at Defendant's trial that Defendant gave him a deadline of February 26, 1999 to negotiate these rebate agreements because they had to be booked in fiscal year 1999. (Tr. of Proceedings at 1050 (Sorkin).) Sorkin further testified that Defendant, Martin Grass, and Timothy Noonan told him that the rebates were a "done deal" and that they were bookable. (*Id.* at 1051–52.) Finally, Frank Bergonzi testified that Defendant was as involved as Martin Grass in giving him reassurances that the Zeneca rebates were final. (*Id.* at 894 (Bergonzi).) This testimony is sufficient for the court to find by a preponderance of the evidence that Defendant was involved in the booking of the $29.6 million Zeneca rebate agreements. Defendant's objection to the inclusion of this amount is overruled.

### B. Inclusion of the BMS litigation settlement and rebate agreements

Defendant objects to the inclusion of the $17 million BMS litigation settlement and the $13 million BMS rebate agreement as losses attributable to him because there is no evidence and no jury finding to support the fact that they were improperly booked. The court disagrees. Again, while the court acknowledges that the Jury did not check the box next to item 71 on the

Verdict Slip, it is apparent from the testimony and evidence presented at trial that Defendant was heavily involved in both of these transactions.

■ First, as to the $17 million BMS litigation settlement the court notes that there was ample trial testimony indicating that Defendant solicited three back-dated letters from a local attorney to provide Rite Aid's outside auditors with reassurance that this settlement was final at the time it was booked. (*See* Tr. of Proceedings at 903, 906 (Bergonzi).)

Second, as to the $13 million in BMS rebate agreements, Frank Bergonzi testified at Defendant's trial that he had various conversations with Defendant regarding the finality of these agreements and the fact that there was no completed contract. (*Id.* at 894, 907.)

Finally, Bergonzi testified that Martin Grass gave him continued reassurances that these monies were final and bookable as fiscal year 1999 income. (*Id.* at 897–98.) Given the various conspiracies involved here, these actions by Mr. Grass are attributable to Defendant because they were both foreseeable and in furtherance of their agreement to defraud Rite Aid. *See* U.S.S.G. § 1B1.3(a)(1)(B). This testimony is sufficient for the court to find by a preponderance of the evidence that Defendant was involved in the booking of both the $17 million in BMS litigation settlement and the $13 million in BMS rebate agreements. Defendant's objection to the inclusion of these amounts is overruled.

### C. Loss calculation attributable to the scheme to inflate Rite Aid's financial statement

■ Defendant's presentence report calculates the total losses to shareholders as a result of Defendant's fraudulent conduct to be $25,396,431. That number is derived by applying the Average Selling Price Methodology, which has been sanctioned by other courts in recent accounting fraud decisions. *See United States v. Bakhit,* 218 F.Supp.2d 1232 (C.D.Cal.2002); *United States v. Grabske,* 260 F.Supp.2d 866 (N.D.Cal.2002); *see also United States v. Snyder,* 291 F.3d 1291 (11th Cir.2002). This method attempts to estimate the effect inflated earnings had upon the value of the company's shares by comparing the average selling price of the stock during the lifetime of the fraud to the average selling price after the fraud was disclosed or corrected via a restatement. *Bakhit,* 218 F.Supp.2d at 1241. Once an average loss per share has been established, it is multiplied by the number of harmed shares to estimate the total shareholder loss. *Id.* at 1242.

In the instant case, the Government looked at 6, 7, and 8 day periods before and after Rite Aid's October 18, 1999 announcement that they were restating their income by more than $500 million. As such, the Government's price comparison window encompassed the period between October 7–28, 1999. According to the Government, it selected this time frame in order to capture the price of Rite Aid stock shortly before Rite Aid announced that its earnings were inflated on October 11, 1999, and the price of the stock after the size of the restatement was disclosed on October 18, 1999. The Government then multiplied the average losses per share over these three time periods by the total number of "innocent" shares (total number of shares minus those held by Defendants or approximately 252.5 million). This calculation yielded "innocent share" losses of $27 million, $135 million, and $248 million for the 6, 7, and 8 day period respectively. Reducing these amounts by the percentage of fraud amount ($92.6 million) to the $500 million restatement results in losses of $5 million,

$25 million, and $46 million. Averaging these figures resulted in the Government's calculation of approximately $25.3 million.

Defendant argues that the method chosen by the Government "ignores reality" and does not reasonably estimate the loss that is attributable to Defendant's conduct. Specifically, Defendant levels three criticisms at the Government's calculation. First, Defendant argues that the Government failed to subtract the 11 cent per share dividend paid on October 14, 1999 from the price of Rite Aid's stock over this time period. Second, Defendant's expert, Dr. Craig McCann, argues that the Government grossly over estimated the number of harmed shares by not limiting its calculation to only those shares that were bought and sold during the period of the fraud. Finally, Defendant's expert argues that the Government's calculation is too simple and that it does not realistically reflect the effect of the fraud on the price of Rite Aid Stock. Defendant's expert posits that the preferred method of calculating shareholder loss in "thickly traded" securities like Rite Aid is to conduct an event study, which measures the out-of-pocket damages to investors by calculating the difference between the fraudulent mispricing in the price paid for the security and the inflation in the sales price. (Def.'s Ex. A, Expert Report by Dr. Craig McCann at 11.) Based on the event study described by Dr. McCann in his report and during a hearing, he calculates that the shareholder loss attributable to Defendant's fraud is zero.

Having had the benefit of the parties briefing on this issue and a hearing at which Defendant's expert testified to his methodology, the court finds that the average selling price methodology advanced by the Government is preferable to the event study methodology advanced by Defendant through his expert. The Government's approach is preferable for a number of reasons. First, it is simple and easy to apply. While this is not always a bench mark of accuracy, several other district courts have applied this methodology because it avoids the uncertainties inherent with dueling experts. See Bakhit, 218 F.Supp.2d. at 1240; Grabske, 260 F.Supp.2d at 875. Second, the Guidelines stress that the court need only make a reasonable estimate based upon available information. U.S.S.G. § 2F1.1 cmt. 9. Finally, a calculation that encompasses a broader range of trading and share prices lessens the impact of outside factors and will likely result in a more accurate estimate of actual loss than the Defendant's figures. Bakhit, 218 F.Supp.2d at 1239.

Even though the court will accept the Government's methodology, the court will make certain adjustments to the Government's calculation in order to more precisely determine the effect of Defendant's fraud on Rite Aid's share price. In particular, the court will reduce the price per share amount by 11 cents per share in order to take into account the dividend paid on those shares on October 14, 1999. Second, the court finds Defendant's estimate of the number of shares harmed to be more accurate than the Government's because it better reflects actual harm to a limited and discrete number of shareholders. Defendant suggests that a more realistic range of shareholders harmed is between 84 million and 118 million. Splitting the difference between these two results in a median figure of 101 million shareholders. Finally, on cross-examination, Defendant's expert admitted that it would be reasonable to extend the fraud period back until the beginning of March 1999 given that the entries in question were booked and disclosed at that time. According to Dr. McCann, extending the window until March 1999 would add another 10%–20%

more shareholders than he calculated. Again, splitting the difference would yield 15% more shareholders harmed than previously calculated. When this percentage is applied to the median number of shareholders harmed as calculated above (101 million) the court concludes that a reasonable estimate of the number of shareholders harmed by Defendant's fraud is 116,-150,000.

In accordance with the foregoing, the court concludes that a reasonable estimate of shareholder loss, based on the information readily available to the court at the present time, is $10,453,500. The court arrived at this figure by adopting the Government's per share loss calculations represented in Government's Exhibit 11 for the 6–day trading average ($0.01), the 7–day trading average ($0.09), and the 8–day trading average ($0.17) and multiplying each of these averages by the number of shares harmed by Defendant's fraud (116,-150,000) and, finally, averaging those calculations.[3] While the court's calculation may not be as precise as Defendant's, the court believes that it is a reasonable estimate of the loss, given the available information. Accordingly, the court will reduce the amount of loss attributable to the scheme to inflate Rite Aid's earnings from $25,396,431 to $10,453,500.

## D. Severance Letters

■ Defendant also argues that the Presentence Report grossly overstates the value of the back-dated severance letters and claims that the losses should not be any higher than $4.5 million. Defendant advances several arguments in this regard. First, Defendant argues that it is improper to include the value of Eric Sorkin's and Philip Markovitz's letters in the equation because the court did not order Martin Grass to pay restitution on these amounts. The court finds Defendant's argument to be misplaced. In Grass's case, the court opted in its discretion not to award restitution to Rite Aid for the amount attributable to Sorkin's and Markovitz's letters in light of the on-going civil litigation between Rite Aid and Grass, Markovitz and Sorkin over these payments and other matters. For restitution purposes, the loss was too difficult to precisely calculate. As a matter of loss, however, the situation is different. The Guidelines do not require the court to calculate loss with precision, but rather merely require the court to look at the greater of actual or intended loss. See U.S.S.G. § 2F1.1 cmts. 8–9. Here, the intended loss was the face value of those letters reduced to their present value. The court will not exclude these losses from the overall loss calculation.

Defendant also argues that the value of his letter ($4.39 million) should not be included in the loss calculations because the jury specifically found that he failed to disclose the letter's existence in his May 10, 1999 Proxy Questionnaire and Rite Aid's June 14, 1999 Proxy Statement. Therefore, Defendant argues, the jury implicitly found the letter existed prior to Grass's resignation and was not back-dated. While clever, the court is not convinced by Defendant's reasoning. There was ample evidence presented at trial sug-

---

**3.** The court's calculation is represented in the following calculation. All of the numbers were adjusted to exclude the $0.11 dividend paid on October 14, 1999 and reduced to reflect the percent of Defendant's fraud to the restatement (18.52%).

$0.01 loss per share times 116,150,000 shares = $ 1,161,500
$0.09 loss per share times 116,150,000 shares = $10,453,500
$0.17 loss per share times 116,150,000 shares = $19,745,500

$$\$31,360,500/3 = \$10,453,500$$

gesting that Defendant's letter was not created until after Grass resigned as CEO of Rite Aid. For instance, there is the testimony of Kevinlee Kirsch, a local printer who testified that the letterhead used for Defendant's severance letter was not created until sometime after October 18, 1999, the date of Grass's resignation. (Tr. of Proceedings at 1242–43 (Kirsch).) Moreover, Janene Kope, Grass's personal secretary, testified that she prepared Defendant's letter, at Grass's direction and with Brown's input, after Grass's October 18, 1999 resignation. (*Id.* at 119–23 (Kope).) This unrebutted testimony is sufficient to meet the Government's burden of proof, and the court will not exclude Defendant's severance letter from the loss calculation.

Finally, Defendant argues that the Government cannot prove what, if any, loss is attributable to Sorkin's and Zink's backdated letters because it cannot prove how much severance these two would have received under Rite Aid's usual custom and practice. For its part, the Government argues that Rite Aid does not have a usual custom and practice of giving its employees a standard severance package. The court agrees with the Government. The Government has demonstrated the present value of Sorkin's and Zink's letters and has met its burden of demonstrating that these letters were generated after Grass resigned as CEO. If Defendant alleges that there was a custom and practice of granting severance benefits then they must demonstrate what that practice entailed. The Government claims that there is no such practice; the court will not ask them to prove a negative. The court will not exclude Sorkin's and Zink's severance letters from the total value of the severance letter losses.

In accordance with the foregoing, the court calculates the total loss attributable to the fraud to be $23,170,452. This loss is derived from adding the value of the severance letters as calculated in Defendant's presentence report ($12,716,952) to the value of the shareholder loss as calculated by the court above ($10,453,500). Because this loss is greater than $20 million, the 16–level enhancement calculated in the presentence report remains unchanged. *See* U.S.S.G. § 2F1.1(b)(1)(Q).

### E. Aggravated Role Enhancement

■ Defendant also objects to paragraph 100 of the presentence report and the four-level increase for his aggravating role in the offense. Defendant argues that he was no longer an executive vice-president or chief legal counsel at Rite Aid during the relevant time period and that the evidence does not prove that Defendant exercised a degree of control or authority over any culpable participant during this period. The court finds Defendant's assertion incredible. There was ample testimony during Defendant's trial from Eric Sorkin, Janene Kope, Tim Harrison, and Philip Markovitz all of whom testified to having received detailed instruction and advice from Defendant. Although not as directly involved as other participants in the fraud-related aspects, Defendant, along with Grass, organized and directed the entire effort to obstruct Rite Aid's internal investigation as well as the Government's criminal and civil investigations. Defendant admits on the Noonan Tapes that he "coached" Eric Sorkin as to what to tell the grand jury. Testimony at trial demonstrated that Defendant told Mary Lou Egan to destroy back-dated LTIP I computer files. Defendant met with Noonan on a number of occasions and encouraged Noonan to withhold information, explaining what should and should not be mentioned. Defendant repeatedly encouraged Janene Kope to lie both before and after her grand jury ap-

pearances. Defendant encouraged Markovitz to provide false testimony regarding when he received his back-dated severance letter. From the court's perspective, the evidence seems clear that Defendant orchestrated, organized and led the extensive obstructive conduct designed to cover up the accounting fraud and, thus, the four-level enhancement is justified.[4]

## III. Motions for Downward Departure

In addition to leveling various objections to the presentence report, Defendant makes two motions for downward departure based (1) on his extraordinary civic and charitable contributions pursuant to U.S.S.G. § 5H1.11 and (2) on his age and physical condition pursuant to U.S.S.G. §§ 5H1.1 and 5H1.4. For the reasons that follow, the court will deny both requests.

### A. Charitable and Civic Contribution

 A downward departure motion on the basis of charitable and civic contributions is a discouraged departure and Defendant bears the burden of proving that his contributions are extraordinary. See U.S.S.G. § 5H1.11 (policy statement).

While there can be no doubt that Defendant has spent much of his life contributing, both financially and otherwise, to private and public charitable endeavors, the court cannot say that his contributions were extraordinary given Defendant's financial resources. Defendant has demonstrated that he gave in excess of $350,000 to charity from 1997 to 2002. While this is commendable, the figure has to be considered in light of Defendant's gross income over this same time period. According to Defendant's income tax returns, Defendant earned $4,959,615 from 1997 to 2002. As such, Defendant's charitable contributions

comprised only 7% of Defendant's income. While generous, the court cannot say that Defendant's contributions were extraordinary for a person of Defendant's means. Accordingly, the court will deny Defendant's motion for downward departure made pursuant to U.S.S.G. § 5H1.11.

### B. Age and Physical Condition

 Defendant also cites his age and physical condition as grounds for a downward departure. As with civic and charitable contributions, one's age and physical condition are not ordinarily relevant in determining whether a departure is appropriate. See U.S.S.G. §§ 5H1.1 and 5H1.4. Admittedly, Defendant suffers from serious health problems. Defendant is 76 years old and suffers from peripheral arterial disease, coronary artery disease, hypertension, and hyperlidemia. Furthermore, at the hearing on this matter, Defendant presented testimony from his medical expert, Dr. Robert Perkel, who described Defendant as "a walking cardiovascular timebomb."

In rebuttal, the Government presented testimony from its own expert, Dr. Charles Chambers, who testified that while Defendant has serious health problems, there is nothing preventing Defendant from receiving appropriate medical care through the Bureau of Prisons. Furthermore, the Government presented a letter from the Bureau of Prisons' Health System Administrator for the Northeast Region, Barbara Cadogan, who indicated that the Bureau has thousands of inmates with medical problems similar to those suffered by Defendant and that there are currently over 600 inmates who are older than 70 years of age. Additionally, Ms. Cadogan indicated that the Bureau has a cardiac care clinic, a hypertension chronic care clinic, and has a

---

**4.** Defendant presents various other objections to the presentence report, but none of them have an effect on Defendant's guideline calculation.

well-established formulary that includes all of Defendant's current medications.

Based on all of the evidence and testimony presented, the court concludes that Defendant did not meet his burden of establishing that the Bureau of Prisons could not provide appropriate medical care for a person of Defendant's age and physical condition. Accordingly, the court will deny Defendant's motion for downward departure on this issue.

## IV. *Conclusion*

The court will overrule all of Defendant's objections to the Presentence Investigation Report and will deny both of Defendant's motions for downward departure. However, the court finds that the amount of the loss attributable to Defendant's fraud is only $23,170,452 as opposed to the $38,113,383 calculated by the probation department. The court will lower that number accordingly, although it has no bearing on Defendant's overall guideline calculation. Thus, if the court were giving a guideline sentence, the court would conclude that Defendant's appropriate offense level is 32, which would produce a guideline range of 121–151 months.

However, as noted above, the court finds that in light of the Supreme Court's decision in *Blakely v. Washington*, the Guidelines, as applied to this case, are unconstitutional. Because the court does not believe that the offending parts of the Guidelines are severable from the unoffending parts, the court will not apply a Guideline sentence in this case and will rely on an indeterminate sentencing scheme in accordance with the principles set forth by Judge Cassell in *Croxford*. *See Croxford*, 2004 WL 1521560 at *1246–48. Although the court will rule that the Guidelines are unconstitutional, the court will use them as a framework to craft an appropriate sentence. An appropriate order will issue.

## ORDER

In accordance with the accompanying memorandum of law, **IT IS HEREBY ORDERED THAT:**

(1) The United States Sentencing Guidelines will not be applied to Defendant's sentencing because to do so would violate Defendant's Sixth Amendment right to have a jury decide all facts that would increase Defendant's punishment. The court, therefore, declares the United States Sentencing Guidelines unconstitutional *as applied* to Defendant's case. The court will sentence Defendant under an indeterminate sentencing scheme.

(2) Defendant's sentencing will be held on Monday, August 30, 2004 at 10:00 a.m. in Courtroom No. 3, Eighth Floor, Federal Building, Third and Walnut Streets, Harrisburg, Pennsylvania.