**UNITED STATES of America**

v.

**Franklin C. BROWN**

**No. CRIM.1:CR–02–146–02.**

United States District Court,
M.D. Pennsylvania.

Feb. 10, 2005.

---

Kim Douglas Daniel, U.S. Attorney's Office, Harrisburg, PA, for USA, Plaintiff.

Ellen C. Brotman, Carroll & Brotman, John Rogers Carroll, Carroll & Brotman, Philadelphia, PA, Peter Goldberger, Law Office of Peter Goldberger, Ardmore, April A. Oliver, Steptoe & Johnson, LLP, Erik L. Kitchen, Steptoe & Johnson, LLP, Washington, DC, Joseph U. Metz, Dil-

worth Paxson LLP, Harrisburg, Matthew L. Stennes, Steptoe & Johnson, LLP, Reid H. Weingarten, Steptoe & Johnson, LLP, Washington, DC, for Franklin C. Brown (2), Defendant.

Edward F. Mannino, Akin, Gump, Strauss, Hauer & Feld, LLP, Jason A. Snyderman, Akin, Gump, Strauss, Hauer & Feld, LLP, Philadelphia, PA, Eric Sitarchuk, Ballard, Spahr, Andrews & Ingersoll, Paul Lantieri, III, Philadelphia, PA, for Rite Aid Corporation, Unknown Party Type.

## MEMORANDUM

RAMBO, District Judge.

Before the court is Defendant's Motion for Bail Pending Appeal (Doc. 772). In the motion, Defendant offers five issues that he asserts justify his release from incarceration during appeal under 18 U.S.C. § 3143(b)(1). The court recently granted Defendant's motion in part. (*See* Doc. 784.) Specifically, the court concluded that its decision to rule the United States Sentencing Guidelines (the "Guidelines") unconstitutional as applied to this case in light of *Blakely v. Washington*, —— U.S. ——, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004) presented a substantial question of law that could have resulted in a significant modification of Defendant's sentence. The court stayed Defendant's sentence until the Supreme Court issued its anticipated decision regarding *Blakely*'s impact on the Guidelines and deferred ruling on the remaining four issues in Defendant's motion.

On January 12, 2005, the Supreme Court rendered an opinion in *United States v. Booker*, —— U.S. ——, 125 S.Ct. 738, —— L.Ed.2d —— (2005), which addressed the effect of *Blakely* on the Guidelines. The court ordered briefing on *Booker*'s impact on Defendant's Motion for Bail Pending Appeal. These issues have now been briefed, and the matter is ripe for disposition.

Upon consideration of the parties' arguments, the court concludes, for the reasons set forth below, that in light of the Supreme Court's ruling in *Booker*, the court's handling of *Blakely* as it applied to this case no longer presents a substantial question of law that could result in a significant modification of Defendant's sentence. Additionally, the court finds that Defendant's four remaining arguments do not justify a release from incarceration pending appeal. Thus, as explained in further detail below, the court will deny Defendant's motion.

## I. *Background*

The background of the instant motion is well-known to the parties and will not be reiterated in detail. The relevant facts are as follows. On June 21, 2002, Defendant was indicted on 36 counts for various offenses including conspiracy, false statements, and obstruction of justice. Defendant, along with a co-defendant, Martin Grass, filed a pretrial motion to suppress evidence of tape-recorded conversations he had with an undercover government informant. Defendant argued that the Assistant United States Attorney, Mr. Kim Daniel, obtained the recorded conversations in violation of Rules 4.2 and 8.4(a) of the Pennsylvania Rules of Professional Conduct. These rules, known as the "no-contact" provisions, prevent an attorney from communicating with a party who is represented by another attorney. In 1998, the McDade Amendment made federal prosecutors accountable to such state laws. *See* 28 U.S.C. § 530B. The court denied Defendant's motion on the ground that Mr. Daniel's conduct did not violate Pennsylvania's "no-contact" rules. The court concluded that Mr. Daniel's actions fell within an exception to such rules in that they were "authorized by law." *See United*

*States v. Grass,* 239 F.Supp.2d 535, 542 (M.D.Pa.2003). Additionally, the court concluded that even if Mr. Daniel had violated the "no-contact" rules, suppression of the tapes was not an appropriate remedy. *Id.* at 539.

Defendant stood trial alone in September 2003 on eleven counts.[1] On October 17, 2003, a jury returned a special verdict form convicting Defendant on ten counts, Counts 1, 10, 12–15, and 33–36. Following trial, Defendant filed motions for judgment of acquittal and for a new trial. One of Defendant's arguments for a new trial was that the court improperly instructed the jury on the elements of aiding and abetting with respect to Counts 10 and 12–15. Although the court conceded that the aiding and abetting instruction was erroneous, the court concluded that a new trial was not warranted. *United States v. Brown,* No. 1:CR–02–146–02, slip op. at 33–34 (M.D.Pa. May 6, 2004). The court found that Defendant had not objected to the wording of the instruction in question; therefore, the court employed a plain error, as opposed to a harmless error, standard. *Id.* at 39. Under this standard, the court determined that the plain error that occurred was not prejudicial to the outcome of the trial because the jury's special findings independently supported Defendant's guilt under a *Pinkerton* theory of liability. *Id.* at 45. Thus, the court denied Defendant's motion for a new trial on this issue.

Following the court's disposition of Defendant's post-trial motions, Defendant filed a supplemental post-trial motion seeking examination of tape-recorded evidence that was used at Defendant's trial to determine whether the Government tampered with the tapes. Defendant had hired three experts who detected anomalies with copies of the tapes and therefore believed that an analysis of the original tapes was warranted. The court rejected Defendant's arguments for three reasons. First, during Defendant's trial, defense counsel retained a forensic audio specialist who examined copies of three of the original tapes and decided not to pursue the matter. *United States v. Brown,* at 555 (M.D.Pa.2004). Second, Defendant was unable to provide any suggestion that the allegedly tampered portions were played to the jury. *Id.* at 555. Finally, because Defendant's experts had discovered anomalies on their copies that did not exist in previous copies, the court concluded that the anomalies were the product of copying error. *Id.* at 556. Thus, the court denied Defendant's supplemental post-trial motion.

Before Defendant's sentencing, the court issued a memorandum and order resolving the objections to Defendant's presentence report. In that memorandum, the court concluded that the Guidelines were unconstitutional as applied to this case in light of the Supreme Court's decision in *Blakely.* *United States v. Brown,* 338 F.Supp.2d 552, 555 (M.D.Pa.2004). Therefore, the court used a discretionary scheme to sentence Defendant, but relied on the Guidelines as "a measuring point to evaluate the seriousness of the offenses as well as the particular role that Defendant played in the commission of those offenses." *Id.* at 556. In resolving Defendant's objections to the presentence report, the court found that Defendant's Guidelines sentence would have fallen within the range of 121 to 151 months. *Id.* at 561–62.

In so deciding, the court considered whether Defendant's sentence should be reduced due to his advanced age and physical condition. The court weighed testimony from experts presented by both parties and concluded that the Bureau of Prisons could provide appropriate medical care for a person of Defendant's age and medical

---

1. The other twenty-five counts were voluntarily dismissed before trial.

condition. *Id.* at 561–62. Defendant also argued for a departure in consideration of his charitable and civic contributions. The court, however, denied Defendant's request, reasoning that Defendant's civic contributions, while laudatory, were not extraordinary for a person of Defendant's significant financial resources. *Id.* at 561. At Defendant's sentencing, the court again considered these arguments as well as an argument that Defendant was vulnerable to abuse in prison. (*See* Tr. of Oct. 14, 2004 Sentencing, Afternoon Session at 2–3.) Defendant was unable to persuade the court that a departure on these grounds was justified. (*Id.*)

On October 14, 2004, Defendant was sentenced to 120 months imprisonment. Defendant's voluntary surrender date was set for December 13, 2004. The instant motion was filed in the interim, and as stated above, the court granted the motion in part on December 6, 2004. The court stayed Defendant's sentence until the Supreme Court issued its then-impending decision regarding the impact of *Blakely.* The Supreme Court rendered an opinion in *United States v. Booker,* —— U.S. ——, 125 S.Ct. 738, —— L.Ed.2d —— (2005) on January 12, 2005. The next day the court ordered briefing on *Booker's* effect on the instant proceedings. This issue, along with the other issues originally presented in Defendant's Motion for Bail Pending Appeal, are now ripe for disposition.

## II. *Legal Standard: Release Pending Appeal*

A motion for release pending appeal is governed by 18 U.S.C. § 3143(b)(1).[2] In *United States v. Miller,* 753 F.2d 19 (3d Cir.1985), the Third Circuit laid out the relevant legislative principles that led to the enactment of § 3143(b)(1). Section 3143(b)(1) came to fruition through the Bail Reform Act of 1984. *Miller,* 753 F.2d at 22. This act modified the standard for bail pending appeal because "Congress wished to reverse the presumption in favor of bail that had been established under the prior statute, the Bail Reform Act of 1966." *Id.* The Third Circuit cited the following as among the reasons that Congress disapproved of the prior standard:

[O]nce a person has been convicted and sentenced to jail, there is absolutely no reason for the law to favor release pending appeal or even permit it in the absence of exceptional circumstances.... [T]he conviction, in which the defendant's guilt of a crime has been established beyond a reasonable doubt, is presumably correct in law, a presumption factually supported by the low rate of reversal of criminal convictions in the Federal system.

**2.** Section 3143(b)(1) provides:

Except as provided in paragraph (2), the judicial officer shall order that a person who has been found guilty of an offense and sentenced to a term of imprisonment, and who has filed an appeal or a petition for a writ of certiorari, be detained, unless the judicial officer finds—
(A) by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released under section 3142(b) or (c) of this title; and
(B) that the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in—

(i) reversal,
(ii) an order for a new trial,
(iii) a sentence that does not include a term of imprisonment, or
(iv) a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process.
If the judicial officer makes such findings, such judicial officer shall order the release of the person in accordance with section 3142(b) or (c) of this title, except that in the circumstance described in subparagraph (B)(iv) of this paragraph, the judicial officer shall order the detention terminated at the expiration of the likely reduced sentence.

*Id.* (internal quotation omitted). Thus, Congress created § 3143(b)(1) to establish a "more stringent rule for bail pending appeal," but not "to deny bail entirely to persons who appeal their convictions." *Id.*

In order to fall within the "exceptional circumstances" that warrant bail pending appeal, the *Miller* court held that a defendant has the burden of proving: (1) that he is not likely to flee or pose a danger to the safety of any other person or the community if released; (2) that the appeal is not for purposes of delay; (3) that the appeal raises a substantial question of law or fact; and (4) that if the substantial question is determined favorably to him on appeal, that decision is likely to result in reversal, an order for a new trial, a sentence that does not include a term of imprisonment, or a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal. *Id.* at 24.

With respect to the third element, a question raised on appeal is "substantial" if it is significant and "one which is either novel, which has not been decided by controlling precedent, or which is fairly doubtful." *Id.* at 23. Subsequent to *Miller*, the Third Circuit concluded that a question without controlling precedent may not necessarily be significant because the issue may be clearly lacking merit. *United States v. Smith*, 793 F.2d 85, 89 (3d Cir. 1986). Therefore, the court clarified its definition of "substantial," declaring that the significance of an issue should be judged by whether it is "debatable among jurists of reason; that a court *could* resolve the issues [in a different manner]; or that the questions are adequate to deserve encouragement to proceed further." *Id.* (internal quotation omitted) (alterations in original). In adopting the "fairly debatable" approach, the Third Circuit rejected the "close question" analysis adopted in other circuits. *Id.* at 90. Under that analysis, a substantial question was a " 'close' question or one that very well could be decided the other way." *Id.* (internal quotation omitted).[3]

3. At first blush, the "fairly debatable" approach is a nebulous standard to apply. Many of the issues confronted by a court during a criminal proceeding are "debatable." Indeed, the very purpose of a judicial tribunal is to resolve knotty disputes, and rare is the instance that jurists of reason will uniformly agree on the particular resolution of a matter. For example, the Supreme Court contains nine reasonable jurists and few of its opinions are decided unanimously. Thus, whether an issue is "debatable among jurists of reason" or could have been resolved in a different manner, *Smith*, 793 F.2d at 89, seems to inadequately reflect Congress's belief that a defendant's conviction "is presumably correct in law," *Miller*, 753 F.2d at 22 (internal quotation omitted). For this reason, the court concludes that the "fairly debatable" standard must have more weight than the phrase "debatable among jurists of reason" implies.

The Third Circuit's reasoning on this issue supports this conclusion. In *Smith*, the Third Circuit rejected the "close question" formulation and adopted the "fairly debatable" approach. *Smith*, 793 F.2d at 90; *see also United States v. Messerlian*, 793 F.2d 94, 96 (3d Cir.1986) ("[W]e are bound by [the "fairly debatable" standard in] *Smith*."). A "close question" is "one that very well could be decided the other way." *Smith*, 793 F.2d at 89 (internal quotation omitted). In rejecting this standard, the Third Circuit must have contemplated that a substantial question is more than merely debatable. The answer to what the Third Circuit intended, however, does not lie in the language it endorsed. In *Smith*, the Third Circuit held that a question is substantial if it is "debatable among jurists of reason; that a court *could* resolve the issues [in a different manner]; or that the questions are adequate to deserve encouragement to proceed further." *Id.* (internal quotation omitted). This language sounds strikingly similar to the language the Third Circuit discarded under the "close question" approach.

In weighing the principles handed down by the Third Circuit, the court concludes that the

■ As for the fourth element, the phrase "likely to result in reversal or an order for a new trial" does not require courts to "predict the probability of reversal." *Miller*, 753 F.2d at 23. This language refers to the "significance of the substantial issue to the ultimate disposition of the appeal." *Id.* Thus, the fourth element is met only in cases where "the question is so integral to the merits of the conviction on which defendant is to be imprisoned that a contrary appellate holding is likely to require reversal of the conviction or a new trial." *Id.*

## III. *Discussion*

■ Defendant asserts that the first two elements of the *Miller* test are satisfied in this case. Additionally, Defendant argues that the following issues are substantial questions that are likely to result in a substantial modification of his sentence: (1) the court's handling of *Blakely* as it applied to Defendant's sentencing in light of the requirements of *Booker*; (2) the court's denial of Defendant's request for downward departure based on health, age, and vulnerability to abuse in prison; (3) the court's denial of Defendant's motion to suppress under the McDade Amendment; (4) the court's resolution of the issue regarding the jury instruction on aiding and abetting that was presented in Defendant's post-trial motion for a new trial; and (5) the court's denial of Defendant's supplemental post-trial motion for examination of the tapes used at Defendant's trial.

At the outset, the court finds, as stated in its December 6, 2004 memorandum, that Defendant is not likely to flee or pose a danger to the community and that Defendant's appeal is not brought for purposes of delay. The court will address Defendant's remaining arguments in turn.

### A. *The Court's Handling of Blakely*

In *Blakely v. Washington*, —— U.S. ——, ——, 124 S.Ct. 2531, 2538, 159 L.Ed.2d 403 (2004), the Supreme Court held that a Washington state sentencing scheme offended the Sixth Amendment because it deprived the defendant of his constitutional right to a jury determination. In *Blakely*, the Supreme Court ruled that

the "statutory maximum" for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of facts reflected in the jury verdict or admitted by the defendant.* In other words, the relevant "statutory maximum" is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings.

*Id.* at 2537 (internal citations omitted). Although the Supreme Court offered no opinion as to whether its ruling extended to the Guidelines, *id.* at 2538 n. 9, this court concluded that the principles in *Blakely* necessarily applied to the instant case and rendered the Guidelines, as applied to Defendant's proceedings, unconstitutional. Thus, the court employed a discretionary sentencing scheme, but relied

---

answer to this murky issue lies in the plain meaning of the phrase "fairly debatable." The pertinent definition of the word "fairly" is "to the full degree or extent: clearly, definitely, actually, plainly, distinctly, fully." Webster's Third New International Dictionary 816 (1981). This definition suggests to the court that the applicable standard requires that an issue be more than simply debatable. Instead, a substantial question is "distinctly" debatable. For instance, as the court con-

cluded in its December 6, 2004 memorandum, the issue of whether the court properly handled the impact of *Blakely* on Defendant's sentencing was "clearly" debatable among jurists. A genuine dispute existed on the issue; the question was more than just a "close call." In short, the court will impose these principles onto the phrase "debatable among jurists of reason" and apply the Third Circuit's "fairly debatable" approach in its truest sense.

on the Guidelines as "a measuring point to evaluate the seriousness of the offenses as well as the particular role that Defendant played in the commission of those offenses." *United States v. Brown,* at 556 (M.D.Pa.2004).

In *United States v. Booker,* —— U.S. ——, ——, 125 S.Ct. 738, 746, —— L.Ed.2d ——, —— (2005), the Supreme Court held that *Blakely* applied to the Guidelines and that the Guidelines violated the Sixth Amendment because they required judges to find facts that enhanced a defendant's sentence beyond what could be imposed based solely on the jury's verdict. To remedy the constitutional defect in the Guidelines, a different majority of the Court severed the two provisions of the Sentencing Reform Act that made the Guidelines mandatory.[4] *Id.* at 756–57. This modification rendered the Guidelines "effectively advisory" and allowed sentencing judges "to tailor the sentence in light of other statutory concerns as well, see § 3553(a)." *Id.* at 757, 764–65. The Court, however, noted that "district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing." *Id.* at 767.[5]

In light of *Booker's* holding, the court concludes that its handling of the *Blakely* issues in this case is no longer a substantial question that would likely require a reversal of Defendant's sentence or a new trial. Defendant's sentence reflects the two major tenets of *Booker.* The court

acknowledged the potential violation of Defendant's Sixth Amendment rights and remedied the violation by imposing a discretionary sentence that considered the Guidelines as well as other factors.

Defendant argues that the court's decision regarding the impact of *Blakely* did not fully satisfy the requirements of *Booker.* Specifically, Defendant contends that reasonable jurists could debate whether the court gave the appropriate weight to the Guidelines. Further, Defendant asserts that the court's alleged failure to consider all of the factors under 18 U.S.C. § 3553(a) will likely result in a reversal of Defendant's sentence. The court rejects these arguments.

■ First, the court explicitly stated that it relied on the Guidelines as "a measuring point," *United States v. Brown,* at 556 (M.D.Pa.2004); therefore, the court clearly implemented the Guidelines in an "advisory" capacity. Defendant argues that the court's use of the Guidelines was "'advisory' in name only." (Def.'s Post-*Booker* Mem. at 5.) In so arguing, Defendant seems to intimate that the court erred by only considering the Guidelines. However, the assertion that the court only considered the Guidelines is flatly wrong. After the court resolved the Guidelines issues in its August 17, 2004 memorandum and order, the court allowed Defendant to submit *further* argument in a sentencing memorandum and to present *additional* character witnesses and oral argument at a hearing on October 14, 2004.[6] (*See* Docs. 756, 763, 769.) The court had already

---

4. The two provisions severed were 18 U.S.C. § 3553(b)(1) (Supp.2004), which makes the Guidelines mandatory, and 18 U.S.C. § 3742(e), which relies on the mandatory nature of the Guidelines. *Booker,* —— U.S. at ——–——, 125 S.Ct. at 756–57.

5. In its December 6, 2004 memorandum, the court implied that the retroactivity of the Supreme Court's decision might be a factor in this case. The Supreme Court, however, explicitly stated that its *Booker* decision applied

to all cases " 'pending on direct review or not yet final.' " *Booker,* —— U.S. at ——, 125 S.Ct. at 769 (quoting *Griffith v. Kentucky,* 479 U.S. 314, 328, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987)).

6. It should be noted that the October 14, 2004 hearing was the *second* hearing the court held to consider Defendant's sentencing arguments. The first was a two-day hearing to address Defendant's objections to the presentence report.

ruled on Defendant's arguments in the Guidelines context, and yet it considered Defendant's additional arguments and ruled on those arguments in open court. (*See* Tr. of Oct. 14, 2004 Sentencing, Afternoon Session at 2–3.) In allowing the presentation of a "second round" of sentencing considerations, no reasonable jurist could debate that the court utilized the Guidelines in an "advisory" capacity in conjunction with the consideration of other factors.

For similar reasons, the court rejects Defendant's contention that the court's alleged failure to consider the factors under § 3553(a) will likely result in reversal. Section 3553(a) directs a sentencing court to consider, among other things, the nature and circumstances of the offense, the history and characteristics of the defendant, and the need to provide the defendant with medical care. *See* 18 U.S.C. § 3553(a)(1)-(a)(2). Additionally, in the so-called "parsimony" provision, the sentencing court must "impose a sentence sufficient, but not greater than necessary, to comply with the purposes [of § 3553(a)(2) ]." 18 U.S.C. § 3553(a). In *Booker*, the Supreme Court contemplated that sentencing courts would consider these factors in addition to the Guidelines. *See Booker,* —— U.S. at —— – ——, 125 S.Ct. at 764–65. Recently, the Fourth Circuit, "the first court of appeals to speak authoritatively [on the issue]," (Def.'s Post-*Booker* Reply Mem. at 2), further defined the relationship between the Guidelines and the § 3553(a) factors. *See United States v. Hughes,* 396 F.3d 374, 378 (4th Cir.2005). In *Hughes,* the Fourth Circuit held that sentencing courts must first cal-

culate the Guidelines range and then consider "other relevant factors set forth in the guidelines and those factors set forth in § 3553(a)." *Id.*

As established above, the court followed the *Hughes* formula in sentencing Defendant. The court first established Defendant's sentencing range under the Guidelines and then conducted a " § 3553(a)-like" analysis. After the court ruled on the Guidelines issues, the court considered Defendant's medical situation and good deeds as well as the amount of the loss and whether Defendant could be characterized as an accessory after-the-fact. (*See* Tr. of Oct. 14, 2004 Sentencing, Afternoon Session at 2–3.) The court even weighed a non-Guidelines factor, vulnerability to abuse. (*Id.* at 2 *ll.*5–13.) As for whether Defendant's sentence was parsimonious, the court imposed a sentence that was one month below the low end of the Guidelines. *See United States v. Wilson,* 350 F.Supp.2d 910, 923 (D.Utah 2005) (noting that a sentence at the low end of the Guidelines is generally considered parsimonious). In short, the Defendant's sentence reflected the essential requirements of *Booker* and is not "likely" to be reversed for this reason.[7]

Defendant also argues that his sentence will be reversed because the court failed to satisfy the requirements of § 3553(c). This provision requires the court, "at the time of sentencing, [to] state in open court the reasons for its imposition of the particular sentence" and if the sentence is outside the Guidelines range, to state the reasons for doing so "with specificity in the written order of judgment and commitment." 18 U.S.C. § 3553(c), (c)(2) (Supp.

---

**7.** For similar reasons, the court rejects Defendant's argument that reasonable jurists could debate whether the court's sentence could be considered "reasonable" on appeal, a standard established in *Booker. See Booker,* —— U.S. at —— – ——, 125 S.Ct. at 765–66. The court obviously gave great consideration to

Defendant's sentence. The court held two hearings and received several briefs on the issues. Additionally, the court considered both the Guidelines and other factors that fall under § 3553(a). Thus, the court concludes that the "reasonableness" of Defendant's sentence is not "fairly debatable."

2004). Despite Defendant's assertions to the contrary, the court fulfilled the first requirement. At the time of sentencing, the court incorporated the reasons from its August 17, 2004 memorandum and order and resolved Defendant's additional arguments in open court. (*See* Tr. of Oct. 14, 2004 Sentencing, Afternoon Session at 2–3.) As for the second requirement, the court concedes that it did not provide the reasons for departing one month outside of the Guidelines range in the order of judgment and commitment. However, given the uncertain circumstances of the post-*Blakely* and pre-*Booker* period, it hardly seems likely that Defendant's sentence would be reversed for failing to provide a reason for a one-month departure from the Guidelines. Thus, the court concludes that Defendant's arguments regarding § 3553(c) do not warrant his release pending appeal. In sum, the court's handling of *Blakely*'s impact on Defendant's sentence does not raise a substantial question that is likely to result in reversal of his sentence.

## B. *The Court's Analysis on Age, Health, and Vulnerability*

■ Defendant contends that the court's refusal to grant his request for a downward departure based on age, health, and vulnerability to abuse in prison presents a substantial question on appeal. Defendant argues that reasonable jurists could debate whether these departures

were warranted under a Guidelines analysis.

Consideration of a defendant's age and physical condition are "not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range." U.S. Sentencing Guideline Manual §§ 5H1.1, 5H1.4 (1998).[8] Further, downward departures for extraordinary physical impairment are rarely granted. *See United States v. Iannone*, 184 F.3d 214, 228 n. 10 (3d Cir.1999) (listing physical condition as a discouraged basis for departure). Likewise, a departure from the Guidelines based on vulnerability to abuse in prison is reserved for extraordinary cases.[9] *See United States v. Cefalo*, 45 Fed.Appx. 111, 112–13, 2002 WL 2004123 (3d Cir.2002).

In weighing these legal principles, the court concluded that Defendant's age, physical condition, and vulnerability to abuse in prison were not "extraordinary." First, the court was persuaded by the testimony of Barbara Cadogan, the Bureau of Prisons Health System Administrator. Ms. Cadogan testified that the Bureau of Prisons treated many inmates with conditions similar to Defendant and that over 600 inmates were older than 70 years of age. Second, the court found that Defendant was unable to present adequate evidence that he would be susceptible to abuse in prison, especially considering his potential placement in a medical facility.[10]

---

**8.** The court relied on the 1998 Guidelines Manual as a guide in calculating Defendant's sentence.

**9.** As noted above, a departure based on vulnerability to abuse in prison is not provided for in the Guidelines; however, the Third Circuit has considered whether it may be a basis for departure from the Guidelines. *See United States v. Cefalo*, 45 Fed.Appx. 111, 112–13 (3d Cir.2002).

**10.** As to the vulnerability to abuse issue, Defendant asserts that the court erroneously "re-

jected the idea of sentencing below the guideline range on this basis" by claiming there was no authority for such a departure because authority exists under § 5K2.0. (Def.'s Mot. for Release Pending Appeal ¶ 12.) Defendant misconstrues the court's reasoning. The court did not "reject the idea" of considering this factor. In actuality, the court weighed the issue, but decided on the merits that a departure was not warranted in Defendant's case. (*See* Tr. of Oct. 14, 2004 Sentencing, Afternoon Session at 2 *ll*.5–13.)

(*See* Tr. of Oct. 14, 2004 Sentencing, Afternoon Session at 2 *ll.*5–13.) In light of the evidence before the court and the governing legal standards for departures for age, health, and vulnerability to abuse, reasonable jurists would not debate the court's denial of Defendant's request for a downward departure on these grounds.

## C. *The McDade Amendment*

■ Defendant argues that reasonable jurists could debate the court's denial of his motion to suppress tape-recorded conversations he had with an undercover government informant under the McDade Amendment. Defendant asserts that the central issues in Defendant's motion to suppress raise substantial questions because the interpretation of the McDade Amendment has never been addressed by the Third Circuit. Further, Defendant contends that jurists of reason could debate the court's conclusion that even if Mr. Daniel had violated the "no-contact" rules, suppression of the tapes was not an appropriate remedy. For the following reasons, the court finds Defendant's arguments unavailing.

First, the court's conclusion that Mr. Daniel's conduct was permissible under the Pennsylvania Rules of Professional Conduct is not "fairly debatable." The court based its conclusion in large part on the Third Circuit's decision in *United States v. Balter*, 91 F.3d 427 (3d Cir.1996). In *Balter*, the Third Circuit examined a New Jersey "no-contact" provision that contained virtually identical language to Pennsylvania's statute and held that "pre-indictment investigation by prosecutors is precisely the type of contact exempted from the Rule as 'authorized by law.'" *Id.* at 436. The court's reliance on this language in *Balter* was bolstered by the fact that several other circuits had held that "no-contact" rules did not prevent non-custodial pre-indictment communications by undercover agents with represented parties during a legitimate criminal investigation. *See United States v. Grass*, 239 F.Supp.2d 535, 541 (M.D.Pa.2003) (citing to cases decided in the Eighth, Tenth, and District of Columbia circuits). The only circuit to stray from this well-established principle was the Second Circuit in *United States v. Hammad*, 858 F.2d 834 (2d Cir. 1988). In *Hammad*, the Second Circuit concluded that "no-contact" rules could be violated in egregious cases, such as the use of a counterfeit grand jury subpoena. *Id.* at 840. However, absent gross misconduct, the "use of informants by government prosecutors in a pre-indictment, non-custodial situation ... will generally fall within the 'authorized by law' exception." *Id.* Because conduct as egregious as using fake court documents was not found to have occurred in this case, reasonable jurists would agree that the court's decision fell well within solid legal footing.[11]

Defendant correctly points out that *Balter* was decided before the enactment of the McDade Amendment and that the Third Circuit has not interpreted the statute in a case presenting similar issues as those in Defendant's motion to suppress. *Cf. United States v. Whittaker*, 268 F.3d 185 (3d Cir.2001). However, a lack of controlling precedent does not necessarily

---

11. Although Mr. Daniel created a fake agenda letter addressed to the informant's attorney for the informant to use during one of the conversations, the court found this conduct to be easily distinguishable from *Hammad*. In *Hammad*, the prosecutor utilized a false court document that was made to look official and contained a forged signature of the Clerk of Court. *Hammad*, 858 F.2d at 840; *see also United States v. Murphy*, 768 F.2d 1518, 1529 (7th Cir.1986) ("In the pursuit of crime, the Government is not confined to behavior suitable for the drawing room. It may use decoys and provide the essentials tools of the offense.").

make an issue substantial. *United States v. Smith,* 793 F.2d 85, 89 (3d Cir.1986). Additionally, the court noted in its decision that the McDade Amendment did not "amend the well-established contours" of Pennsylvania's "no-contact" rules. *Grass,* 239 F.Supp.2d at 544. In other words, because "the McDade Amendment's lone function was to make state rules of professional responsibility applicable to the conduct of Government attorneys," *id.,* and did not change the substance of those rules, *Balter* and the circuit decisions supporting it apply with equal force following enactment of the statute. *Id.* at 541 n. 5. Thus, *Balter's* formidable legal support for the court's decision on Defendant's motion to suppress remains in place even though the Third Circuit has not taken up the interpretation of the McDade Amendment.

Defendant also argues that reasonable jurists could debate the court's reasoning that even if Mr. Daniel had violated the "no-contact" rule, suppression of the tapes was an inappropriate remedy. In so deciding, the court concluded that suppression would not remedy the alleged violation of Defendant's rights. *Grass,* 239 F.Supp.2d at 547. Defendant cites to *United States v. Bowman,* 277 F.Supp.2d 1239 (N.D.Ala.), *vacated on other grounds by* 2003 WL 23272667, 2003 U.S. Dist. LEXIS 24817 (N.D.Ala.2003) as support for his argument. The Northern District of Alabama's decision in *Bowman,* however, is inapposite. In *Bowman,* the court suppressed recorded statements because the statements were procured after the initiation of adversarial proceedings. *Id.* at 1243. Because the defendant's Sixth Amendment rights were so clearly violated, suppression was warranted. *Id.* at 1244. The *Bowman* court even weighed this court's decision in *Grass* and found it inapplicable. *Id.* at 1243. Thus, the *Bowman* decision could not create doubt in a reasonable jurist's mind that suppression

was an inappropriate remedy in Defendant's case. Regardless, even if the court's conclusion was "fairly debatable," that conclusion was made in the alternative. As established above, the court's finding that Mr. Daniel did not violate Pennsylvania's "no-contact" provisions is firmly rooted in the law, and the court's denial of Defendant's motion to suppress could have stood on that ground alone. In short, Defendant has not met his burden of establishing that the court's decision to deny his motion to suppress is a substantial question.

### D. *The Aiding and Abetting Instruction*

 Defendant contends that the court's resolution of Defendant's motion for a new trial with respect to the jury instruction on aiding and abetting is "fairly debatable" for two reasons. First, jurists could debate whether defense counsel's objection to the instruction was sufficient to avoid plain error review. Second, jurists could dispute the court's conclusion that the error in question did not affect Defendant's substantial rights. The court will address each argument in turn.

■ In order to determine whether an alleged error is reviewed under a plain error or harmless error standard, the court must determine whether the defendant objected to the challenged decision. *See United States v. Retos,* 25 F.3d 1220, 1228 (3d Cir.1994) (noting that the failure to object to a jury instruction at trial is reviewed under a plain error standard). The court's May 6, 2004 memorandum and order discusses *ad nauseam* its reasons for concluding that Defendant's counsel at trial failed to raise an adequate objection to the aiding and abetting jury instruction. The gravamen of the court's reasoning was that while defense counsel objected to giving *any* aiding and abetting instruction, he

did not make a specific objection to the wording of the instruction. Federal Rule of Criminal Procedure 30(d) clearly contemplates that objections to jury instructions will be "specific." *See also United States v. Castro*, 776 F.2d 1118, 1129 (3d Cir.1985) ("The specificity requirement is not mere formalism. Without a specific objection, the trial judge is not apprised adequately of the disputed matter and of the need to take corrective action to avoid a new trial.").

Defendant argues that the Third Circuit's opinion in *United States v. McCulligan*, 256 F.3d 97 (3d Cir.2001) would lead a reasonable jurist to debate the court's reasoning. In *McCulligan*, the defense counsel did not mention the exact legal principle that supported his objection, but argued the general terms that should have triggered the trial court to address his concern. *Id.* at 100–01. Any reasonable jurist would agree, however, that *McCulligan* is distinguishable from the instant matter. In the case at hand, the focus of defense counsel's objection was that the Indictment did not support an aiding and abetting charge. Nothing that was presented to the court could be construed as a signal that the *wording* of the jury instruction was erroneous. Thus, reasonable jurists could not debate that a plain error analysis was warranted.

■ As to Defendant's assertion that reasonable jurists could debate the court's analysis on whether the error affected Defendant's substantial rights, the court finds that Defendant's arguments are without merit. The court reasoned that the error in question was not prejudicial to Defendant because the jury's findings on the special verdict form for the affected counts, Counts 10 and 12–15, demonstrate an independent basis for guilt based on a *Pinkerton* theory of liability. Defendant argues that under *United States v. Murphy*, 323 F.3d 102 (3d Cir.2003), the court improperly relied on an alternative theory of liability. The court addressed this argument in its May 6, 2004 memorandum and distinguished that case on the ground that it involved a general verdict form. Because the jury completed a special verdict form at Defendant's trial, the court was able to determine the basis for Defendant's guilt under *Pinkerton* apart from an aiding and abetting theory. Defendant contends that the findings in the special verdict form are insufficient to satisfy the *Pinkerton* standard. The court, however, traced the findings in the special verdict to the elements of *Pinkerton* in its memorandum and order of May 6, 2004. *See United States v. Brown*, No. 1:CR–02–146–02, slip op. at 44–49 (M.D.Pa. May 6, 2004) (citing to specific paragraphs of the verdict form that establish *Pinkerton* liability). Thus, the assertion that the court's reasoning regarding the effect of the aiding and abetting jury instruction error on Defendant's rights is not "fairly debatable."

### E. *Examination of the Tapes Used at Trial*

■ Finally, Defendant asserts that reasonable jurists would dispute the court's decision to deny Defendant's supplemental post-trial motion seeking examination of tape-recorded evidence used at his trial. Defendant brought this motion after he had obtained new counsel. In order to determine if the tapes had been tampered with, Defendant had hired three experts who reported that anomalies existed in copies of the tapes. The court rejected Defendant's request to inspect the tapes because the tapes had already been inspected during the trial and defense counsel did not raise the issue at that time. Further, there was no suggestion that the allegedly tampered portions were presented to the jury. Thus, reasonable jurists could not dispute the court's decision to

deny Defendant's supplemental post-trial motion.

Defendant argues that his experts produced firm evidence of tampering; however, his experts analyzed *third* generation copies that contained errors that were not even found in previous copies. Defendant also argues that the court's order on this issue deprived him of the ability to determine whether his rights had been violated under *Brady* due process principles. Defendant, however, did not raise this issue with the court until nine months after the trial. Regardless, the above considerations weighed by the court demonstrate that further inspection of the tapes was not warranted. Because Defendant failed to produce any solid basis for inspecting the tapes, the court's decision to deny Defendant's supplemental post-trial motion is not "fairly debatable."

In sum, the court concludes that none of the issues raised by Defendant are substantial issues that are likely to result in reversal or a new trial. In other words, Defendant is unable to rebut the presumption in favor of denying bail on appeal. *See United States v. Miller*, 753 F.2d 19, 22–23 (3d Cir.1985). Because Defendant has not met the elements under 18 U.S.C. § 3143(b)(1), his release during appeal would "destroy[ ] whatever deterrent effect remains in the criminal law." *Id.* at 22 (internal quotation omitted).

## IV. *Conclusion*

In accordance with the foregoing discussion, the court will deny Defendant's Motion for Bail Pending Appeal. An appropriate order will issue.

### ORDER

In accordance with the accompanying memorandum of law, **IT IS HEREBY ORDERED THAT:**

1) Defendant's Motion for Bail Pending Appeal (Doc. 772) is **DENIED.**

2) The stay of Defendant's sentence is **LIFTED.**

3) The court's order regarding voluntary surrender (Doc. 771) is amended to reflect that Defendant shall surrender himself to the Attorney General no later than 1:00 p.m. on Tuesday February 22, 2005 by reporting to the Minimum Security Prison Camp located at the Federal Correctional Institution at Schuylkill in Minersville, Pennsylvania.